1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

UNITED STATES OF AMERICA          *
5                                 *    Docket No.: 11-CR-95
versus                            *    Section "R"
6                                 *    New Orleans, Louisiana
EFRAIN GRIMALDO                   *    September 2, 2014
7    * * * * * * * * * * * * * * * *

8             TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE SARAH S. VANCE
9               UNITED STATES DISTRICT JUDGE

10

APPEARANCES:
11

For the Government:          U.S. Attorney's Office
12                            BY:  JOHN F. MURPHY, ESQ.
                             BY:  THEORDORE R. CARTER, ESQ.
13                            650 Poydras Street
                             Suite 1600
14                            New Orleans, Louisiana 70130

15

16   For the Defendant:          Eddie J. Jordan, Jr., LLC
                             BY:  EDDIE JACK JORDAN, JR., ESQ.
17                            303 South Broad Street
                             3rd Floor
18                            New Orleans, Louisiana  70119

19

20   Official Court Reporter:    Jodi Simcox, RMR, FCRR
                             500 Poydras Street
21                            Room HB-275
                             New Orleans, Louisiana 70130
22                            (504) 589-7780

23

Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

OFFICIAL TRANSCRIPT

2

1                          **I N D E X**

2                                                      Page

3
WILLIAM LAWRENCE JOHNSON
4        Direct Examination By Mr. Murphy:            6
         Cross-Examination By Mr. Jordan:            25
5        Redirect Examination By Mr. Murphy:         56

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        OFFICIAL TRANSCRIPT

1       **<u>PROCEEDINGS</u>**

2       **(September 2, 2014)**

3                              **\*\*\*\*\*\***

4

5       (COURT CALLED TO ORDER)

6       **THE DEPUTY CLERK:**  Criminal Docket 11-95, *United*

7  *States of America versus Efrain Grimaldo.*

8              Counsel, please make your appearance for the

9  record.

10      **MR. MURPHY:**  Good afternoon, Your Honor.  John Murphy

11 and Ted Carter on behalf of the United States.

12      **MR. CARTER:**  Good afternoon, Your Honor.

13      **MR. JORDAN:**  Good afternoon, Your Honor.  Eddie

14 Jordan on behalf of Efrain Grimaldo.  Mr. Grimaldo is present

15 before the Court.

16      **THE COURT:**  All right.  I need the defendant up at

17 the podium when we get started.

18              This matter is before the Court for

19 sentencing -- do we have an interpreter?

20      **MR. MURPHY:**  Your Honor, we did not use an

21 interpreter at trial and I believe none is necessary.

22      **THE COURT:**  All right.

23              This matter is before the Court for sentencing.

24 Is there any reason that sentence cannot be imposed at this

25 time?

OFFICIAL TRANSCRIPT

1          **MR. JORDAN:**  No, Your Honor, other than to deal with

2    the drug quantity issue as indicated in Your Honor's order.

3          **MR. MURPHY:**  And no need for delay from the

4    government, Your Honor.

5          **THE COURT:**  All right.  Mr. Grimaldo, have you

6    received a copy of the presentence investigation report?

7          **THE DEFENDANT:**  Yes, Your Honor.

8          **THE COURT:**  Have you had an opportunity to read it

9    and go over it with your lawyer?

10          **THE DEFENDANT:**  Yes, Your Honor.

11          **THE COURT:**  I understand that the government has no

12    objections to the report.  Is that correct?

13          **MR. MURPHY:**  Correct, Your Honor.

14          **THE COURT:**  And I understand that the defendant has

15    15 objections, which I'll summarize.

16                One, he objects to the arrest date in the PSR.

17                Two, to two aliases ascribed to him in the PSR.

18                Three, to criminal history points assigned to

19    him for a sexual assault conviction.

20                Four, factual information provided about his

21    parents.

22                Five, the quantity objections, which are grouped

23    together, and they go to whether he was a member of a cocaine

24    distribution ring, whether he distributed cocaine in the

25    Eastern District of Louisiana or any other district.  He

1    maintains that he was not the main source of supply in a drug

2    conspiracy; he was not a supplier of cocaine; he's not

3    responsible for the quantity of cocaine attributed to him in

4    paragraphs 13, 14, 18, 20, 22, 23, or 26 of the PSR.

5              And the quantity objections also include his

6    objection to the basis for the fact finding as to the total

7    drug quantities attributable to him, which are in paragraphs 34

8    to 37 of the PSR.  This section of the report concludes that,

9    in addition to the documented quantities contained in the PSR,

10   the conspiracy involved at least 1600 kilograms of cocaine

11   hydrochloride.

12             He also objects to the PSR's fact finding that

13   he was a cell leader in the Los Zetas drug cartel; that his

14   role in the conspiracy merits a four-point enhancement to his

15   base offense level for his role as a leader/organizer.

16             Is that the sum total of the objections?

17        **MR. JORDAN:**  I think those are all the objections.

18   And we've also asked for the two-point reduction as well.

19        **THE COURT:**  Right.  For the change in the guidelines,

20   which is not in effect yet.

21        **MR. JORDAN:**  Yes, Your Honor.

22        **THE COURT:**  All right.  I understand the government

23   wants to put on evidence as to quantity.

24        **MR. MURPHY:**  We do, Your Honor.  We have, I think,

25   maybe 20 minutes of testimony -- we'll move through it fairly

WILLIAM LAWRENCE JOHNSON - DIRECT

1  quickly -- regarding the two issues that the Court has
2  instructed us to be prepared for today.  One being drug
3  quantity, and two being leadership role.
4          **THE COURT:**  Okay.  Let's proceed with the evidence.
5          **MR. MURPHY:**  Your Honor, at this time, we call DEA
6  Special Agent, and the case agent in the case, Larry Johnson.
7          (WHEREUPON, **WILLIAM LAWRENCE JOHNSON**, having been
8  duly sworn, testified as follows**:)**
9          **THE DEPUTY CLERK:**  Please state your full name and
10 correct spelling for the record.
11         **THE WITNESS:**  William Lawrence Johnson,
12 J-O-H-N-S-O-N.
13                   **DIRECT EXAMINATION**
14 BY MR. MURPHY:
15 **Q.**  Special Agent Johnson, you are the same Special
16 Agent Johnson who testified in the trial of this matter; is
17 that correct?
18 **A.**  Yes, sir, I am.
19         **MR. MURPHY:**  Your Honor, with the permission of the
20 Court, I'd like to put up one, and only one, exhibit, and put
21 it on the ELMO screen so all can see it.  It's labeled as
22 Attachment C.  It was attached to the government's filing
23 pursuant to the Court's order on quantity assessment.
24         **THE COURT:**  All right.
25         **MR. MURPHY:**  All right.  It's now displayed on the

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1  ELMO on the screen for all to see.

2  **BY MR. MURPHY:**

3  **Q.**   Now, Special Agent Johnson, I'm going to talk to you first

4  about quantity, and then we'll turn to leadership role.

5  **A.**   Yes, sir.

6  **Q.**   I'm going to talk to you about quantity limited strictly

7  to what was contained within the record of trial.  And then for

8  sentencing purposes, I'm going to talk to you about the larger

9  quantity, which includes relevant conduct based on your own

10  investigation and the investigation of others.  Okay?

11  **A.**   Yes, sir.

12  **Q.**   Now, let's talk first about the quantity contained in the

13  record of trial and as displayed on Exhibit C.

14        We limited the quantity for Special Agent Ortiz.

15  Could you talk about the quantity that's limited to him and how

16  that ties into the conspiracy?

17  **A.**   On the first -- the first thing listed above is the one

18  kilogram of cocaine that was purchased -- that was arranged to

19  be purchased from Mr. Grimaldo and Aldo Perez-Marquez.  That

20  was conducted in Beaumont, Texas.  John Wesley, who testified

21  at Mr. Grimaldo's trial, was the confidential source that was

22  arranging that one-kilo deal.

23        Once the transaction was completed, as you can see up

24  there, it says 999.1 grams being cocaine hydrochloride and

25  four grams being cocaine base.  The four grams of cocaine base

WILLIAM LAWRENCE JOHNSON - DIRECT

1  that was included overall in the one kilo was what they used to
2  test the purity of the cocaine that was purchased on that day.
3              MR. JORDAN:  Your Honor --
4  BY MR. MURPHY:
5  Q.   And was there audio recording --
6              THE COURT:  Wait.  Stop.
7  BY MR. MURPHY:
8  Q.   -- in which the defendant --
9              MR. JORDAN:  Your Honor --
10             THE COURT:  Wait.  Stop.
11             MR. JORDAN:  -- I'm just going to have a continuing
12  objection to hearsay summarizing all of the evidence at trial
13  inasmuch as the trial transcript speaks for itself and is the
14  best evidence of what the agent is testifying to.
15             THE COURT:  Overruled.  I find the testimony helpful,
16  and I'm familiar with the trial record and I can -- but it's
17  helpful to have the summary of it, so I'm going to permit it.
18  I find it sufficiently reliable to permit him to testify about
19  it.
20             MR. JORDAN:  Note our objection for the record, Your
21  Honor.
22             THE COURT:  All right.  Proceed.
23  BY MR. MURPHY:
24  Q.   Special Agent Johnson, was this also -- this one or nearly
25  one kilogram, 99.91 [SIC] grams supported in the evidence with

WILLIAM LAWRENCE JOHNSON - DIRECT

1  an audio-recorded call in which the defendant himself
2  participated in arranging the delivery of this amount of
3  cocaine?
4  A.   Yes, sir, it was.
5  Q.   This other discussion about other quantities, I believe,
6  up to four kilos of cocaine hydrochloride up in Houston
7  involving the defendant, we did not include that in the chart;
8  is that correct?
9  A.   No, sir, we did not.
10 Q.   And is the reason because we wanted to come up with the
11 most conservative figure from the record of trial?
12 A.   Yes, sir, it was.
13          THE COURT:  So what are you talking about?  What else
14 besides the one kilo are you talking about?
15          MR. MURPHY:  There was additional testimony cited by
16 the defense in their memorandum, and it's also contained in the
17 record of trial, where there were additional quantities that
18 were not seized in Houston involving Efrain Grimaldo.
19          We made a prosecutorial decision that when we
20 went into the record, we would take the most conservative
21 approach in coming up with a figure from the record.
22          THE COURT:  Okay.
23          MR. MURPHY:  And I'm simply highlighting that in the
24 record, there are additional quantities in Houston where this
25 seizure came from, but we did not include because there was no

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1  seizure and because we felt that the most conservative approach

2  was not to include those other Houston quantities.

3          I raise that simply because the defense, in

4  their memo, talks about that.

5          **THE COURT:**  Okay.  I got it.  I got it.

6          **MR. MURPHY:**  Okay.

7          **THE COURT:**  Okay.

8  BY MR. MURPHY:

9  **Q.**  All right.  Let's move on to the second block that

10 includes Aldo Perez-Marquez, Sabino Duarte, and Lester Talley.

11 We're treating them as a group for quantity determinations; is

12 that correct?

13 **A.**  Yes, sir.

14 **Q.**  And why are we doing that?

15 **A.**  Because during the time frame, Aldo Perez, Sabino Duarte,

16 and Lester Talley were operating at the same time.  Mr. Tally

17 being the recipient of the cocaine.  Mr. Perez and Mr. Duarte

18 were the transporters from Texas.

19          All three individuals gave specific numbers.  Aldo

20 Perez spoke of 100 kilograms -- at least 100 kilograms that he

21 delivered for Mr. Grimaldo.  Sabino Duarte spoke of an amount

22 of cocaine that he delivered.  And Mr. Tally spoke of an amount

23 that he received.

24          So instead of saying it was 100 kilos for Mr. Perez,

25 100 kilos for Mr. Duarte, and 100 kilos for Mr. Tally, giving

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1  300 kilos, since they worked up in the same time and not trying

2  to overlap and falsely raising the amount, since Mr. Tally

3  spoke of 100 kilos, and Mr. Perez spoke of 100 kilos, that's

4  the number we went with.

5  **Q.**   And was that done specifically to avoid any double

6  counting?

7  **A.**   That is correct.

8  **Q.**   Now, there was a seizure that involved this cluster of

9  individuals from Lester Talley; is that correct?

10 **A.**   Yes, sir, there was.

11 **Q.**   That's noted in the second column by those three names

12 where 379.2 grams of cocaine hydrochloride was seized.  There

13 was testimony at trial, but very quickly, just summarize how

14 that's related to these individuals.

15 **A.**   Well, at the time of Mr. Talley's arrest, when I arrested

16 Mr. Talley, and based on my interview with Mr. Talley, and also

17 Mr. Talley's testimony at Mr. Grimaldo's trial, both Mr. Talley

18 admitted to myself, and also testified at trial, that he was in

19 possession of what he says was approximately half a kilogram of

20 powder cocaine at the time of his arrest.

21       The 379.2 grams was the analysis in weight from the

22 DEA lab results on that particular seizure.

23 **Q.**   And where did the evidence show where that amount came

24 from?

25 **A.**   I'm sorry?

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1   Q.   Where did the evidence show that that amount came from?
2   A.   It came from Mr. Grimaldo.
3   Q.   And that 379.2 grams is included within the 100 kilograms;
4   is that correct?
5   A.   Yes, sir, it is.
6   Q.   All right.  Let's go on to the third block.  Officer Bales
7   and John Wesley.  That relates to the Tennessee seizure; is
8   that correct?
9   A.   That is correct.
10  Q.   And summarize briefly how that seizure is connected with
11  this conspiracy, and specifically the intended recipient in New
12  York who was supposed to get this?
13  A.   During the course of my investigation, obviously, I found
14  out of the 31.4 -- 04 kilograms of cocaine that was seized in
15  Chattanooga, Tennessee.  I interviewed two witnesses -- two
16  witnesses that, in fact, testified at Mr. Grimaldo's trial --
17  both John Wesley and David Garza who were witnesses when the
18  31 kilos was actually loaded into the car hauler for its final
19  destination to New York City.
20          Both the witnesses also identified a man who they
21  called "Green Eyes," who was actually -- I later identified as
22  Reynaldo Bello, who was present in Houston, Texas, at the time
23  that the cocaine was loaded in the car hauler.
24          Once the load was intercepted in Chattanooga,
25  Tennessee, I learned that a controlled delivery was done.  And,

WILLIAM LAWRENCE JOHNSON - DIRECT

1  in fact, Mr. Bello, along with another Dominican citizen, Omar

2  Morales, were arrested in New York -- New York City for the

3  cocaine.  Agents and DEA in New York actually worked that case,

4  and I received that information from them.

5          And I also, at the time of Mr. Grimaldo's arrest,

6  after I did the search warrant to his BlackBerry in 2012, found

7  pictures -- multiple pictures of him and Reynaldo Bello, the

8  person who ended up being the recipient of those drugs, in his

9  phone.

10  Q.   All right.  The intended recipient?

11  A.   The intended recipient.

12  Q.   It never made it to New York?

13  A.   Mr. Bello never received the package, no, sir.

14  Q.   And Mr. Bales, who's noted in block 3 of the chart, is it

15  in fact true that he was -- he participated in the seizure of

16  the 31.04 kilograms of cocaine?

17  A.   Yes, sir, he was.

18  Q.   And John Wesley, in his testimony, did he indicate that,

19  in fact, he was aware that this cocaine was seized by law

20  enforcement?

21  A.   Yes, sir.

22  Q.   And the 31.04 is included in the 500 kilograms of John

23  Wesley that we'll talk about at the bottom of the chart; is

24  that correct?

25  A.   That is correct, sir.

WILLIAM LAWRENCE JOHNSON - DIRECT

1  **Q.**   All right.  Let's talk about the next block.  David Garza

2  and Veronica Garza.  Let's first begin with an

3  acknowledgment -- and it's referenced on page 10, Footnote 5 of

4  the government's memorandum to the Court on sentencing -- that

5  there is some unknown overlap between the drugs of David Garza

6  and Lester Talley; is that correct?

7  **A.**   There may be, yes, sir.

8  **Q.**   Okay.  And what can you say, generally, about that?

9  **A.**   When we talk about Mr. Garza, and along with talking about

10 Mr. Perez, Mr. Duarte, and Mr. Talley, Mr. Garza was delivering

11 cocaine to Mr. Talley in Houma as a part of the Grimaldo

12 organization from a period of time up until his arrest, which I

13 believe was between 2007 and 2008, before Mr. Perez and

14 Mr. Duarte were a part of the actual conspiracy.

15         I'm sorry.  I can't remember the exact date of when

16 Mr. Garza was arrested.  But I know that Mr. Garza and

17 Mr. Perez had never met each other.  They do not know each

18 other.  So the 100 kilos that Aldo Perez contributes to what he

19 did is independent of the 100 kilos that Mr. Garza claims that

20 he delivered.

21         Mr. Talley is the common denominator.  He received

22 the drugs from Mr. Garza for a period of time, and then

23 received drugs that were delivered by Mr. Garza and delivered

24 by Mr. Perez at two separate times.  But Mr. Perez and

25 Mr. Garza never intersected.

WILLIAM LAWRENCE JOHNSON - DIRECT

1   **Q.**   And is there evidence that David Garza distributed drugs
2   to cities other than Houma?
3   **A.**   Yes, sir.
4   **Q.**   And what cities are those?
5   **A.**   The one that I'm aware of is Houston, Texas.
6   **Q.**   Okay.  But we do acknowledge that there is some known
7   overlap in drug quantity between David Garza and Lester Talley?
8   **A.**   Yes, sir.
9   **Q.**   And we simply don't know what that amount is?
10  **A.**   No, sir.
11  **Q.**   All right.  Veronica Garza is also on that list and
12  provided information about large cash she saw and counting
13  machines?
14  **A.**   Yes, sir.
15  **Q.**   Can you summarize what your investigation learned about
16  her and her involvement, as it relates to quantity?
17  **A.**   Briefly.  Ms. Garza was a witness, along with her husband,
18  in -- at Mr. Sergio Grimaldo, Efrain Grimaldo's brother's,
19  residence and other places where they would count money.  There
20  were drugs present.  And she said it was just part of their
21  lifestyle.  The husbands dealt with the money and drugs; the
22  wives were present and just saw things and didn't handle that
23  part of the business.
24          And she testified that she witnessed both her
25  husband, Sergio Grimaldo, and Mr. Efrain Grimaldo counting

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1   large amounts of drug proceeds, and there was cocaine present.
2   **Q.**   All right.  And she is not used to add any weight beyond
3   what's listed for David Garza, is that correct, in our
4   calculation?
5   **A.**   That is correct, yes, sir.
6   **Q.**   Finally, John Wesley.  We have calculated him to involve
7   500 kilograms of cocaine hydrochloride.  Is it, in fact -- is
8   it a fact that we have no overlap between John Wesley and the
9   other co-defendants in drug quantities?
10  **A.**   That is correct.
11  **Q.**   And can you explain that?
12  **A.**   Mr. Wesley worked independently of Mr. Garza and
13  Mr. Talley.  Mr. Wesley had a separate business relationship
14  with both Sergio and Efrain Grimaldo.  Mr. Wesley had numerous
15  customers in numerous cities in the southeast part of the
16  United States and was being supplied the cocaine that he was
17  delivering to those cities, which included Memphis, Tennessee;
18  Pensacola, Florida; and Jackson, Mississippi.  That cocaine,
19  according to his testimony at trial, came from the Grimaldos.
20  **Q.**   All right.  Now, on page 8 of the government's sentencing
21  memorandum, specifically Footnote 4, we do reference testimony
22  in which John Wesley delivered some cocaine to Houma,
23  Louisiana; is that correct?
24  **A.**   That is correct.
25  **Q.**   Was that individual that received cocaine hydrochloride in

WILLIAM LAWRENCE JOHNSON - DIRECT

1  Houma, Louisiana, different from Lester Talley?

2  A.    It was, sir.

3  Q.    Not the same person?

4  A.    No, sir.

5  Q.    So there's no double counting John Wesley with Lester

6  Talley's quantities; is that correct?

7  A.    That is correct, sir.

8  Q.    All right.  Now, what we just went through is a -- would

9  you say is a conservative quantity assessment based strictly on

10  the record of trial?

11  A.    I would say it's a very conservative assessment, sir.

12  Q.    And it's limited to the record of trial; is that right?

13  A.    To the record of trial, yes, sir.

14  Q.    Based on your investigation, did you calculate additional

15  quantities beyond what was contained in the record of trial to

16  arrive at your figure of 1,600 kilos approximately?

17  A.    Yes, sir, I did.

18  Q.    Could you explain how you arrived at that figure?

19  A.    During the course of my investigation, I found out that

20  there were two other offices in two other federal districts

21  that were actually investigating the Grimaldo brothers for

22  cocaine trafficking.  One being the DEA office in Houston,

23  Texas.  The other being the FBI office in Mobile, Alabama.

24         So during the course of my overall investigation,

25  when I start learning the scope and the size of the

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1    organization that the Grimaldos had, I started interviewing
2    case agents from the FBI office in Mobile, so task force
3    officers and FBI special agents.
4            I learned through them that their main target was
5    a -- was one of the Grimaldos' prime customers, a man by the
6    name of Daron Jones, who was a large-scale drug trafficker out
7    of Houston, Texas.  He controlled -- he delivered large amounts
8    of cocaine to numerous cities in the Midwest and the East Coast
9    that included Detroit, Michigan; Baltimore, Maryland; Dover,
10   Delaware; Washington, D.C., and then in the South of Mobile,
11   Alabama.  And obviously the Bellos -- Mr. Bello ran New York.
12           All of those drugs, according to Mr. Jones in his
13   statements to the FBI, were supplied to him by the Grimaldos,
14   Sergio Grimaldo, Efrain Grimaldo, and a man by the name of
15   David Segovia (phonetic).  Due to Mr. Jones' statements, he
16   said he averaged between five to ten kilos twice a week from
17   the Grimaldos for a period of approximately two years.
18   Q.   When you say "the Grimaldos," you mean both the defendant
19   in this case and his brother, Sergio Grimaldo?
20   A.   That is correct.  That is correct.
21           So, once again, working on the most conservative
22   numbers that I had, I took Mr. Jones' estimate of five kilos
23   twice a week, which is 10 kilos a week.  At 52 weeks a year,
24   we're looking at 520 kilos a year, times two is 1,040.  Then
25   add Mr. Wesley's 500, and then Mr. Garza's 100, and Mr. Perez,

WILLIAM LAWRENCE JOHNSON - DIRECT

1  Duarte, and Mr. Talley's 100, that is over 1600 kilos, I
2  think -- well, close to over 1700.  So it was actually a much
3  lower estimate than the numbers that were provided to me.
4          And we're talking a scope of the FBI's case, DEA
5  Houston's case, and my case.  I think their case started back
6  in 2004/2005.  Mr. Grimaldo was arrested in 2012.  So we're
7  looking at seven or eight years to almost 11 cities -- well, 10
8  cities -- 11 counting Houma -- in the United States.  It seemed
9  like a very conservative number.
10 Q.   All right.  And to get to that number, you're relying on
11 relevant conduct outside the evidence that was admitted at
12 trial; is that correct?
13 A.   That is correct, sir.
14 Q.   Let's talk now about the roles and leadership of this
15 defendant, Efrain Grimaldo.  I'd like to go through the
16 defendants that appear on this chart, plus I would like to add
17 his brother, Sergio Grimaldo.
18 A.   Yes, sir.
19 Q.   And describe the role that this defendant, Efrain
20 Grimaldo, played in terms of organization and leadership and
21 control in the charged conspiracy.  So let's go through these
22 names.  I'll let you start where you want, but I want to cover
23 all of them, and I want to cover Sergio Grimaldo as well.
24 A.   Okay.
25 Q.   And describe their activity and their control by the

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1   defendant.

2   **A.**   To talk about both Efrain and Sergio Grimaldo, as I

3   learned through my investigation and as the witnesses testified

4   in trial, the two of them basically were one.  They worked

5   together.  The brothers worked together.

6        But based on the record of trial, both Aldo Perez,

7   Sabino Duarte, David Garza, and John Wesley all testified that

8   they worked directly with both Grimaldo brothers, that they

9   took orders from the Grimaldo brothers, used the Grimaldo

10   brothers, Efrain and Sergio, as their main source of supply.

11   They were the ones that they had to go to to get the drugs.

12        Aldo and Sabino specifically said that they waited

13   for instructions from either Efrain or Sergio Grimaldo to say

14   where the drugs were to be picked up and who the drugs were to

15   be delivered and where the money was to go to afterwards.

16        Lester Talley, in his testimony, stated that he both

17   spoke with Efrain and Sergio Grimaldo.  And, in fact, after

18   David Garza's -- David Garza's arrest, Mr. Efrain Grimaldo

19   comes to Houma, Louisiana, to meet Lester Talley to

20   specifically tell him that Mr. Grimaldo is his new source of

21   supply and that they would be working with Mr. Grimaldo.

22   **Q.**   All right.  And did we go over John Wesley?

23   **A.**   Yes, sir.

24   **Q.**   Okay.  And Veronica Garza, not a charged defendant, played

25   a role in travels to Houma, is that correct, in her testimony

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1  in the trial?

2  A.   She did play a role.  And I did forget to speak of David

3  Garza as well in the organizational structure.

4  Q.   Okay.

5  A.   According to Mr. Garza, at one time, Mr. Garza considered

6  himself to be above both Sergio and Efrain Grimaldo for a

7  period of time.  And then later -- and we learned that in our

8  investigation.

9       And later on, their main source of supply at the

10  time, a man by the name of Salvador Obiendo basically lifted

11  the Grimaldo brothers above David Garza, and then David Garza

12  started working for the Grimaldos and sourcing his cocaine from

13  Sergio and Efrain Grimaldo.

14       As for Veronica Garza, she too did work -- or at

15  least took some trips with her husband, David.  But Veronica,

16  as far as her statements to me, she took orders from her

17  husband.

18  Q.   All right.  Was there also evidence in the trial of the

19  payments to the co-conspirators and the accumulation of

20  substantial wealth that corroborate the leadership role and the

21  quantity of this thing?

22  A.   Yes, sir.

23  Q.   And could you explain that?

24  A.   Mr. Wesley spoke of proceeds in excess of $10 to

25  $12 million that would be split between Efrain and Sergio

WILLIAM LAWRENCE JOHNSON - DIRECT

1    Grimaldo and himself.  And that in discussions amongst them,
2    that then the Grimaldos would take that U.S. currency, take it
3    back to Mexico in order to pay off their suppliers and their
4    bosses down in Mexico.
5    **Q.**   And what, if anything, did the expensive jewelry that was
6    shown at trial show for you as an investigator as a
7    corroborative piece of evidence on leadership and quantity?
8    **A.**   That Mr. Grimaldo and his brother had accumulated a large
9    amount of wealth and money selling drugs.
10   **Q.**   All right.  And what you just testified to regarding
11   leadership role, that's information that came from the record
12   of trial; is that right?
13   **A.**   That is correct.
14   **Q.**   All right.  Let's turn next to another aspect of
15   leadership and that is a drug -- Mexican drug cartel known as
16   the Zetas?
17   **A.**   Yes, sir.
18   **Q.**   Are you familiar with the Zeta organization as it operates
19   in Mexico and the United States?
20   **A.**   I am, sir.
21   **Q.**   Is this defendant, Efrain Grimaldo, a member of the Zetas?
22   **A.**   Yes, sir, he is.
23   **Q.**   Could you explain that, please?
24   **A.**   Mr. Grimaldo is -- first and foremost due to a lot -- due
25   to independent witnesses that I've talked to, both Efrain and

WILLIAM LAWRENCE JOHNSON - DIRECT

1    Sergio Grimaldo lay claims and stated that they were members of
2    the Los Zetas drug cartel.  A public records search that I
3    conducted even showed that the Mexican government recognized
4    Sergio Grimaldo and Vladimir Gomez, Mr. Grimaldo's
5    brother-in-law, as members of the Los Zetas drug cartel.
6         Independent witnesses from the Mobile, Alabama's
7    case, Houston's case, and my case state that they are members
8    of the Los Zetas drug cartel.
9         The area from which Mr. Grimaldo is from is a town --
10   a city called Matehuala in the state of San Luis Potosi, which
11   is the heart of Los Zetas' territory.  If you operate and you
12   sell drugs and you're in that city, you're doing it for the
13   Los Zetas drug cartel.  Mr. Grimaldo's brother was recently
14   arrested in Mexico as a member of a 16-member Los Zetas cell.
15   **Q.**   And have you investigated yourself how the Los Zetas
16   distribute drugs throughout the United States?
17   **A.**   Basically, from what I've studied, yes, sir.
18   **Q.**   Okay.  And what have you learned?
19   **A.**   The Los Zetas drug cartel, as cartels go, have been around
20   for maybe approximately ten years.  They are former Mexican
21   police officers, former Mexican special operations guys who now
22   are training street gang members and things like that in
23   tactics.
24        They're very well known for their use of technology
25   and for their use of violence.  And they control different

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - DIRECT

1    routes coming up through Mexico through Monterrey and across
2    the border to eventually get delivered to the United States.
3    Q.   There are a number of cartels that operate in Mexico for
4    drug distribution; is that right?
5    A.   Yes, sir.
6    Q.   Are the Los Zetas one of the major ones?
7    A.   Yes, sir, they are.
8    Q.   And are they expanding in their scope and influence in
9    drug distribution?
10   A.   It would appear so, yes, sir.
11   Q.   All right.  The one connection we have to this district --
12   we had testimony about distribution in other cities outside
13   this district.  But the testimony we had involving this
14   conspiracy in this district is Houma, Louisiana.  Why Houma?
15   Do you have any knowledge based on your investigation why Houma
16   was the central point of this conspiracy in this district?
17   A.   Well, it was the central point of my investigation because
18   Houma is in the Eastern District of Louisiana.  The case, for
19   me, originated as a local impact case into a violent drug gang
20   called the "Up The Bayou Boys" or the UBB.
21        Houma, at the time, was going through a large amount
22   of drug-related homicides.  In fact, in 2009, prior to us
23   arresting eight members of their leadership, they had 11 drug
24   related homicides, which I know in a major city isn't a lot,
25   but in a town like Houma, Louisiana, is immense.  And it was

WILLIAM LAWRENCE JOHNSON - CROSS

1    their highest rate to date.
2            We identified this gang.  We targeted this gang.  And
3    as we continued the investigation, we learned that the gang was
4    being supplied by Lester Talley, Mark Griffin, Jerome Scott.
5    Jerome Scott and Mark Griffin worked for Mr. Talley.  Then we
6    inevitably learned that Mr. Talley was getting his drugs from
7    the Grimaldo brothers.  So the Grimaldo brothers' cocaine was
8    directly going to this -- the UBB street gang in Houma.
9            **MR. MURPHY:**  All right.  Your Honor, if I may have
10   just a moment.
11           Your Honor, we would tender the witness.
12           **THE COURT:**  Okay.  Cross-examination.
13           **MR. JORDAN:**  Yes, Your Honor.
14                        **CROSS-EXAMINATION**
15   BY MR. JORDAN:
16   **Q.**   Special Agent Johnson, you would agree that you did never
17   seize $10 million in connection with this investigation; isn't
18   that true?
19   **A.**   I never seized it, no, sir.
20   **Q.**   And, in fact, you didn't seize any substantial sum of
21   money directly from Mr. Grimaldo or anyone directly tied to
22   Mr. Grimaldo; isn't that true?
23   **A.**   I didn't seize any money from Mr. Grimaldo, no, sir.
24   **Q.**   Okay.  And as far as jewelry is concerned -- you talked
25   about expensive jewelry -- the only proof that you have of

WILLIAM LAWRENCE JOHNSON - CROSS

1  jewelry is some photographs that were introduced as evidence in
2  this case; is that correct?
3  A.   Yes, sir.
4  Q.   And you don't know for a fact what the actual value of
5  that jewelry was or is, do you?
6  A.   No, sir, I don't.
7  Q.   And, in fact, you don't really have any proof that
8  Mr. Grimaldo owned that -- those pieces of jewelry, do you?
9  A.   All I know is he was wearing those pieces of jewelry, sir.
10 Rather, he -- just that he wore them.
11 Q.   Okay.  And you would admit that he did not have any real
12 estate of any substantial value in his name as a result of your
13 investigation?
14 A.   I knew there was a large residence in Matehuala.  I don't
15 know if it was in Mr. Grimaldo's name.  I mean, that house is
16 in Mexico and I have no way of finding out if it's in his name.
17 I know that's where he resided and it was a very large
18 compound.
19 Q.   But you did do a public records search in Mexico to
20 determine whether Mr. Grimaldo was a member of Los Zetas; isn't
21 that correct?
22 A.   I went through the computer, ran names, and, yes, sir, I
23 found that public record -- records from Mexico that identified
24 Mr. Grimaldo -- Sergio Grimaldo and his brother-in-law,
25 Mr. Vladimir Gomez, as members of the Los Zetas drug cartel.

WILLIAM LAWRENCE JOHNSON - CROSS

1  **Q.**   So, again, you don't have any proof that there are any
2  records showing that Mr. Grimaldo owned any real estate in the
3  country of Mexico; isn't that true?
4  **A.**   That is true, yes, sir.
5  **Q.**   And that would be true of the United States as well,
6  wouldn't it?
7  **A.**   That is correct, yes, sir.
8  **Q.**   Okay.  Now, as far as that public record that you talked
9  about with regard to the Los Zetas, you don't have a copy of
10 that today with you, do you?
11 **A.**   No, sir, I don't.
12 **Q.**   Okay.  Now, as far as vehicles are concerned, did your
13 investigation show that Mr. Grimaldo owned any expensive
14 vehicles?
15 **A.**   Under Efrain Grimaldo's name, no, sir.  I just found
16 numerous pictures of him in high-end vehicles, driving high-end
17 vehicles and things like that.
18 **Q.**   And you would agree, would you not, that just because he
19 was in that vehicle doesn't mean that that vehicle belonged to
20 him?
21 **A.**   Well, I mean, I can say that I don't know if it was in his
22 name.  But, counselor, remember he was traveling under false
23 ID.  I don't know if -- if he had several false identities.  I
24 don't know of all the identities he used.  But as in vehicles
25 under the name of Efrain Grimaldo, no, sir.  I would bear to

WILLIAM LAWRENCE JOHNSON - CROSS

1   say that I think he wouldn't do that because he was -- he was
2   wanted at the time.
3   **Q.**   And that would apply to -- that would apply to any real
4   estate as well?  You didn't find any records of real estate or
5   anything of that kind?
6   **A.**   No, sir, but I don't -- I didn't assume that I would.
7   **Q.**   And as far as bank accounts are concerned, did your
8   investigation involve a search for drug proceeds that you would
9   expect for this quantity of cocaine?
10  **A.**   Bank accounts in Mr. Grimaldo's name?
11  **Q.**   Yes.
12  **A.**   No, sir.  And, once again, based on the reason that
13  Mr. Grimaldo, when he was in the United States, didn't want
14  anyone to know that Efrain Grimaldo was in the United States.
15  So, logically, I don't see how we could have found any accounts
16  under Efrain Grimaldo's name.
17  **Q.**   So isn't it fair to say, Special Agent Johnson, that all
18  of the information that you received about the assets, the
19  money, the property that Mr. Grimaldo acquired in connection
20  with his alleged drug trafficking activity, that was based upon
21  information provided by the various individuals who claimed
22  that they were involved in drug trafficking; isn't that true?
23  **A.**   Based on all of their statements towards me, interviews,
24  interviews of other law enforcement officers, photographs and
25  things that we seized from his phone and from Mr. Perez's

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   computer, yes, sir.

2   **Q.**   Now, Special Agent Johnson, how long have you been doing

3   this kind of work?

4   **A.**   Fourteen years.  Well, for DEA 14 years.  Seventeen years

5   total.

6   **Q.**   And isn't it fair to say that, from time to time, people

7   who are informants or who cooperate with the government do

8   embellish the facts?

9   **A.**   Are you talking about this -- this case specifically or in

10  general that --

11  **Q.**   Well, first of all, I'm talking about general, and then

12  let's go into the specifics.

13  **A.**   I think it's a fair statement to say, Mr. Jordan, that at

14  times there are cooperators who would embellish, yes, sir.

15  **Q.**   Okay.  Now, as far as when we look at the first witness,

16  Special Agent Ortiz -- or Officer Ortiz, you attribute one --

17  basically, one kilo or I guess it's 999.1 grams, almost a kilo,

18  of cocaine to Mr. Grimaldo based upon the testimony that he

19  gave; is that correct?

20  **A.**   Based on the testimony, based on the recorded telephone

21  calls between the CI and Mr. Grimaldo, based on the testimony

22  of Mr. Perez.

23  **Q.**   And is that the --

24  **A.**   We have a lot of things that corroborate that one kilo,

25  yes, sir.

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   **Q.**   And that is the transaction that took place in Beaumont,
2   Texas, at the theater; is that correct?
3   **A.**   Yes, sir, that is correct.
4   **Q.**   And you believed that Mr. Perez was telling the truth
5   based upon the fact that you were able to seize that quantity
6   of drugs from the Nissan Titan; is that correct?
7   **A.**   Strictly based on Mr. -- I'm sorry, sir.  Could you
8   rephrase your question for me?
9   **Q.**   Your belief that Mr. Grimaldo was involved in that
10  quantity of cocaine is based, at least in part, on the fact
11  that you seized that quantity of drugs from that Nissan Titan;
12  isn't that true?
13  **A.**   In part, yes, sir.
14  **Q.**   Okay.  Now, you don't have similar quantities for that
15  100 kilos -- 100 kilograms that are attributed to deliveries
16  involving Mr. Marquez, Mr. Duarte, and Mr. Talley, do you?
17              **THE COURT:**  What is the question?
18  **BY MR. JORDAN:**
19  **Q.**   You don't have similar amounts being representative of
20  that quantity of cocaine that you attribute to those three
21  individuals; isn't that true?
22  **A.**   From those individuals, sir?  That's what --
23              **THE COURT:**  What is your question, Mr. Jordan?  You
24  have not seized or --
25

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   BY MR. JORDAN:

2   Q.   It was not seized from them.  You don't have -- you were

3   never able to put your hands on that drugs -- or those drugs or

4   ever able to see them; isn't that true?

5   A.   I seized a lot of drugs in the course of the

6   investigation, sir, that could be attributed.  But if you're

7   saying did I seize 100 kilos from Mr. Perez or Mr. Duarte or

8   Mr. Talley at one time, if that's the question, no, sir, I did

9   not.

10  Q.   Well, in fact, you only seized the 379.2 grams that was

11  seized as part of this investigation; isn't that true?

12  A.   No, sir, that's not true.  I seized 379.2 grams from

13  Mr. Talley that both Mr. Talley -- that all three, Mr. Talley,

14  Mr. Duarte, and Mr. Marquez all admit that they delivered, and

15  it was received through Mr. Talley.  I received -- I seized --

16  I don't have an exact way of -- a bunch of cocaine, cocaine

17  base from other individuals that is attributed to Mr. Talley

18  over quite a few years.

19         But if your question is, did I ever seize 100 kilos

20  at one time from either of those individuals, either

21  Mr. Marquez, Mr. Duarte, or Mr. Talley, the answer is, no, sir.

22  Q.   Well, you didn't seize 50 kilos either, did you?

23  A.   Over the span of the case?

24  Q.   Attributed to those three individuals, Mr. Marquez,

25  Mr. Duarte, or Mr. Talley?

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   A.   At one time or cumulative, sir?

2   Q.   Cumulatively, you didn't seize 50 kilograms of cocaine

3   from those three individuals related to the testimony that

4   Mr. Perez-Marquez gave about his activities with respect to

5   Mr. Grimaldo?

6   A.   Again, Mr. Marquez, Mr. Duarte, and Mr. Talley, did I ever

7   seize 100 grams at one time?  No, sir.  Did I ever seize

8   50 kilos at one time from either of those individuals?  No,

9   sir, I did not.

10  Q.   And you didn't even receive 25 kilograms; isn't that true?

11  A.   Did I ever seize it from those gentlemen?  No, sir, I did

12  not.

13  Q.   Okay.  And wouldn't you agree that wrappings sometimes are

14  used to estimate the quantity of drugs that are being handled

15  by drug offenders?  Wrappings of cocaine or heroin or whatever

16  the drug might be?

17  A.   And what about the wrappings, sir?

18  Q.   Isn't that used from time to time by agents to estimate

19  how much drugs are involved?

20  A.   No, sir.

21  Q.   That's never used?

22  A.   I've never -- I'm confused on your question.  I've never

23  used wrappings as --

24  Q.   When -- okay.  When the drugs cannot be found --

25  A.   Okay.

WILLIAM LAWRENCE JOHNSON - CROSS

1  **Q.**   -- or the drugs are not available, isn't it a fact that
2  agents sometimes use wrappings to determine what the quantity
3  of drugs is?
4  **A.**   I think I understand your question now.  If I were to,
5  say, find three wrappings that I know as being kilos, can I
6  make an assumption, an educated guess, that there were
7  three kilos there?
8  **Q.**   Yes.
9  **A.**   Absolutely.  Was that done in this case?  No, sir.
10  **Q.**   And, in fact, there were no wrappings of any kind that
11  were found with respect to those transactions or those
12  deliveries; isn't that true?
13  **A.**   Well, just the wrapping from the one kilo that we bought
14  from Mr. Grimaldo and Mr. Perez, there was that wrapping, but
15  nothing like what you're describing, sir.
16  **Q.**   So wouldn't you agree that that relatively small quantity
17  that you seized in connection with the alleged activities of
18  Perez, Duarte, and Talley is not in any way representative of
19  the enormous amount of drugs that Mr. Perez testified to at
20  trial?
21  **A.**   The drugs that I seized is not representative; is that
22  what you said, sir?
23  **Q.**   That quantity that was seized that was produced as an
24  exhibit was not representative; isn't that true?
25  **A.**   Oh, not at all.  I mean, the organization was all over --

WILLIAM LAWRENCE JOHNSON - CROSS

1    their organization covered 11 different cities.  So is

2    379 grams representative?  No, sir.  Is the 31-kilo one-time

3    seizure more representative of how much drugs this organization

4    was moving?  I would say that's more representative.

5    Q.    Well, isn't it a fact, Special Agent Johnson, that in

6    order to know whether an informant is telling the truth, you

7    have to be able to verify that?

8    A.    That is correct, sir.

9    Q.    And isn't it a fact that you were not in a position to

10   verify his claim that he was involved with the distribution of

11   100 kilograms or more of cocaine?

12   A.    I was in a position to interview numerous people, sir,

13   separate and independent of each other, and many of the stories

14   that -- well, all the interviews I conducted were very similar,

15   told the similar story of the amount of drugs in which Efrain

16   and Sergio Grimaldo brought into the United States, and they

17   were all kilogram quantities over, again, 11 different U.S.

18   cities.

19   Q.    But you would agree that no agent was ever able to confirm

20   or verify the information provided by one of the individuals

21   who ultimately testified because in the sense that he did

22   not -- no agent was able to find any wrappings or any money

23   directly associated with those transactions or the drugs

24   themselves; isn't that true?

25   A.    No wrappings were ever recovered.  I did recover

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   photographs of Mr. Grimaldo holding large sums of money.  I did

2   receive photographs of signs of wealth of Mr. Grimaldo.

3   Anything like wrappings seized or did we ever arrest

4   Mr. Grimaldo with a load of cocaine in his car?  No, sir, we

5   did not.

6   Q.   So, basically, we must rely, to a very large degree, on

7   the credibility of Mr. Perez, Mr. Duarte, and Mr. Talley if

8   we're going to believe that 100 kilograms of cocaine was

9   involved in this matter; isn't that true?

10   A.   But we're not just relying on their testimony, sir.  We

11   have recorded phone calls of them arranging large drug deals.

12   We have seizures.  We have more than just the word of three

13   cooperating witnesses.

14   Q.   And the phone call that you're talking about relates to

15   that earlier transaction; isn't that true?

16   A.   Yes, sir, I do.  Well, one of the calls, Mr. Jordan.  One

17   of the calls.

18   Q.   Now, Mr. Chapa had nothing to do with Mr. Grimaldo; isn't

19   that true?

20   A.   No, sir, that's not true.

21   Q.   Mr. Chapa was not a person who supplied Mr. Efrain

22   Grimaldo; isn't that true?

23   A.   No, sir, that's not true.

24   Q.   Is there testimony that supports any of that?

25   A.   That Mr. --

WILLIAM LAWRENCE JOHNSON - CROSS

1  **Q.**   That Mr. Chapa had direct dealings with Mr. Efrain
2  Grimaldo?
3  **A.**   Yes, sir.  I have -- we showed several photographs of them
4  together at trial.
5  **Q.**   Well, in fact, you don't have any references by
6  Agent Ortiz indicating that they were in communication with
7  each other; isn't that true?
8  **A.**   No, sir, that's not true.  There was nothing presented at
9  trial, no, sir.
10  **Q.**   Okay.  Nothing at trial.  And is it -- to the best of your
11  knowledge, Mr. Efrain Grimaldo had no direct dealings with
12  Mr. Aguirre either; isn't that true?
13  **A.**   I don't know anything of the relationship between
14  Mr. Grimaldo and Mr. Aguirre, no, sir.
15  **Q.**   Now, the transactions that Mr. -- or Agent Ortiz talked
16  about involving Mr. Chapa and Mr. Aguirre, isn't it a fact that
17  Mr. Efrain Grimaldo was not directly involved in that initial
18  transaction that Agent Ortiz talked about?
19  **A.**   Between --
20       **THE COURT:**  Are we retrying the case now?  I mean, he
21  didn't even talk about that on direct.
22       **MR. JORDAN:**  Well, I want to make it clear, Your
23  Honor, that I think that drugs were mentioned in this case that
24  Mr. Efrain Grimaldo had nothing to do with and he should not be
25  held --

WILLIAM LAWRENCE JOHNSON - CROSS

1       **THE COURT:**  Well, I get what you're saying, but

2   this -- I mean, that was not even brought out on direct, so I

3   can't tell what you're crossing him about because there was no

4   direct testimony about those two other individuals, trying to

5   link him to those two other individuals.

6       **MR. JORDAN:**  No.  No.  There wasn't, Your Honor.

7   There was a mention of Mr. Chapa and Mr. Aguirre in a

8   transaction that was involved in the very beginning of the

9   trial, and I'm concerned that that quantity should not be

10  considered as part of --

11      **THE COURT:**  You think the jury didn't count it?

12      **MR. JORDAN:**  I don't think they did.

13      **THE COURT:**  Okay.  Move on.  Just keep going.

14      **MR. JORDAN:**  I don't think they did.

15      **MR. MURPHY:**  Your Honor, I just want to -- I have

16  found a section where David Garza did talk about Mr. Chapa, and

17  I've located it in the record.  I think since Mr. Jordan has

18  gone into it a bit, I think it's fair to show it to Mr. Jordan,

19  show it to the witness, and let them clarify that issue.  Okay?

20      **THE COURT:**  Well, you can do that on redirect.

21      **MR. MURPHY:**  Okay.

22      **THE COURT:**  Let's proceed.

23  BY MR. JORDAN:

24  Q.  Now, Mr. Chapa, his name is Salvador Garcia; isn't that

25  correct?

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1    A.    Salvador Garcia Obiendo.

2    Q.    Okay.  And isn't it true that the transactions involving

3    Mr. Chapa were transactions where he was the direct supplier

4    for a period of time for Mr. Garza; is that correct?

5    A.    For Mr. Garza and for both Grimaldo brothers.

6    Q.    And, in fact, there was an indication as well that

7    Mr. Efrain Grimaldo was not present for many of the

8    transactions that Mr. Garza was involved with; isn't that true?

9    That he indicated that Mr. Efrain Grimaldo was back and forth

10   between Mexico and the United States?

11   A.    There was a time when David Garza, for lack of a better

12   term, on the hierarchy scale was above Efrain and Sergio

13   Grimaldo.  That relationship changed to where Efrain and Sergio

14   Grimaldo then rose above Mr. Garza at some point in time.

15           Now, the incidents that you're speaking of with

16   Sergio Aguirre and those individuals, I don't know what that

17   situation is, but we never attributed any of those drugs from

18   Sergio Aguirre to Mr. Grimaldo.

19           The drugs that you are seeing that's up on the ELMO

20   now are what is the drugs attributed based on the court of

21   record.  And then my 1600 that I talked to during the PSI

22   included the drugs from the Mobile, Alabama case.  So the whole

23   part about Sergio Aguirre, it has never even been calculated in

24   the drugs being attributed to Mr. Efrain Grimaldo.

25   Q.    Well, you would admit, though, that there was testimony

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  that Mr. Chapa was providing drugs not to Mr. Efrain Grimaldo,
2  but to Mr. Sergio Grimaldo?  That was the testimony in the
3  record; isn't that a fact?
4  A.   Yes, sir, but the Grimaldo brothers were involved in a
5  conspiracy.  They worked together.  They were one and the same.
6  Q.   Well, you say that they were involved in a conspiracy, but
7  there is testimony indicating that Mr. Efrain Grimaldo was not
8  present on more than one occasion -- on several occasions and
9  that at times he was merely present; isn't that a fact?
10 A.   I don't recall that testimony, sir, but, okay.  I don't
11 recall that exact testimony.
12        THE COURT:  I think if you want to use testimony, it
13 would be good if you showed him what you're talking about
14 because I don't remember it, and you're trying to do this for
15 me and I don't know what you're talking about.
16        MR. JORDAN:  Well, in fact, it's in my memorandum,
17 and I specifically -- I'd point out to the pages and -- let's
18 see.
19 BY MR. JORDAN:
20 Q.   When we're talking about Mr. David Garza, he testified
21 that he delivered 20 kilograms of cocaine to Mr. Efrain
22 Grimaldo's brother at the house on Colleen Meadows; do you
23 remember that?
24        MR. MURPHY:  Your Honor, if a specific reference is
25 being made to Mr. Jordan's memo, could he direct us to where --

OFFICIAL TRANSCRIPT

Case 2:11-cr-00095-SSV-MBN   Document 495   Filed 04/30/21   Page 40 of 96


40

WILLIAM LAWRENCE JOHNSON - CROSS

1              MR. JORDAN:  On page 7 of my memo.  That's at
2    page 217 of the transcript.
3    BY MR. JORDAN:
4    Q.   Agent, you remember that?
5    A.   I do recall them speaking of drugs being delivered to
6    Sergio Grimaldo's residence on Colleen Meadows, yes, sir.
7    Q.   And it goes on to say here that Garza testified that he
8    and Mr. Efrain Grimaldo would talk about the merchandise.  You
9    remember that?  Would talk about the merchandise?
10   A.   I don't recall, but if I could see -- is there a
11   transcript I could take a look at?
12   Q.   Okay.  And that's -- again, that's page 217.
13             MR. MURPHY:  Your Honor, I have the transcript here.
14   In fact, I have it -- to be complete, I believe that the
15   witness should look at 217, 218, and 219.  And I'm happy to
16   hand it to the witness.
17             MR. JORDAN:  I don't have a problem with that.
18             THE COURT:  Go ahead.
19             THE WITNESS:  All right, sir.
20   BY MR. JORDAN:
21   Q.   Okay.  And you see on page 217, if you look at that
22   page --
23   A.   Yes, sir.
24   Q.   -- where it says that Mr. Garza and Mr. Grimaldo would
25   talk about the merchandise?

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1   **A.**   What line are you -- would you like me to look at, sir?
2   **Q.**   Let's see.  I know it's on 217.
3           **MR. JORDAN:**  May I approach the witness, Your Honor?
4           **THE COURT:**  You may.
5           **MR. JORDAN:**  Thank you, Your Honor.
6           **MR. MURPHY:**  Your Honor, may I suggest we put it on
7   the ELMO so we can all look at the transcript together?
8           **THE COURT:**  That's fine with me.
9           **MR. MURPHY:**  Ma'am, I'm sorry?
10          **THE COURT:**  Yes.
11          **MR. MURPHY:**  Let me, with permission of the Court, so
12  everybody, including the defendant, can see the portions of the
13  transcript that we're referencing, I'm going to place it on the
14  ELMO.
15  **BY MR. JORDAN:**
16  **Q.**   And you see toward to the bottom it says:
17          "Q.  Did you ever discuss these deliveries with
18      Efrain?"
19          And your answer is:
20          "A.  Yes.  There was times" --
21          Or this is what Mr. Garza said:
22          "A.  Yes.  There was times when he was there we would
23      talk about the merchandise."
24          Isn't that correct?
25  **A.**   Yes, sir.

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  **Q.**   And, in fact, based upon the testimony of Mr. Garza,
2  Mr. Efrain Grimaldo did not play a major role in many of these
3  transactions because he was simply there and he was discussing
4  the drugs, according to Mr. Garza, but did not do much more;
5  isn't that true?
6  **A.**   No, sir.  I believe Mr. Garza's testimony was that Sergio
7  and Efrain Grimaldo worked as a team.
8  **Q.**   And isn't it a fact that there was some testimony by
9  Mr. Garza that Mr. Efrain Grimaldo tested the drugs, but it's
10  impossible to test the drugs if he was not present; isn't that
11  true?
12  **A.**   If he's not present?  Yes, sir.  He couldn't test the
13  drugs if he wasn't there to test the drugs.
14  **Q.**   And so if he's indicating on one hand that Mr. Efrain
15  Grimaldo was generally back and forth and yet he was testing
16  the drugs, the suggestion is regularly, isn't that -- wouldn't
17  you say that's a meaningful conflict in his testimony?
18  **A.**   Well, counselor, I mean, I don't -- I don't know.  I mean,
19  if someone's --
20          **THE COURT:**  This is an argumentative question.  He's
21  going to give you an argumentative answer, so move on.
22          **MR. JORDAN:**  Okay.  It is, and I'll move on, Judge.
23  **BY MR. JORDAN:**
24  **Q.**   Now, you admit that there is some overlapping in the Garza
25  and Talley drug counts; isn't that true?

WILLIAM LAWRENCE JOHNSON - CROSS

1  **A.**   There is -- Mr. Talley is the common denominator there.

2  Mr. Talley says 100 kilos.  Mr. Perez-Marquez says 100 kilos.

3  Mr. Garza says 100 kilos.  However, Mr. Garza and Mr. Perez

4  have never met, have never had any business dealings together.

5  So Mr. Perez's recollection of 100 kilos is separate and

6  independent of Mr. Garza's.

7          Mr. Talley said 100 kilos.  That's what Mr. Talley

8  recollects.  If he's saying it's due to both, then that's what

9  Mr. Talley's statement is.

10         But what I do know for sure is Mr. Perez and

11  Mr. Garza never worked together, because Mr. Garza was in

12  federal prison, and then Mr. Grimaldo recruits Mr. Perez out of

13  Arizona.  So Mr. Perez's 100 kilos and Mr. Garza's 100 kilos

14  are two separate things.

15  **Q.**   But you admit that there's some overlapping there and --

16  **A.**   I admit that Mr. Talley's saying 100 kilos.  I believe

17  that is a lower number.  That's a low number.

18  **Q.**   Well, you don't have any basis for that other than what

19  you've heard from other inmates; isn't that true?

20  **A.**   My basis is 100 kilos for Mr. Perez; 100 kilos for

21  Mr. Garza.  These two never worked together, so that would be

22  200 separate kilos.

23  **Q.**   And, Agent, don't you find it peculiar that 100 is always

24  the number that they come up with whenever they're pressed

25  about what the number is?  Because they don't remember the

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  number, they always come up with 100?

2  **A.**   I think them not remembering the number demonstrates the

3  amount of drugs that they were dealing with, that 100 kilos is

4  a number that they use if they don't remember.  To me,

5  Mr. Jordan, that's a large number.  I mean, I know if -- I

6  know --

7          **THE COURT:**  We're arguing about a number that -- I

8  mean, this is not going anywhere either.  You know, I'm not

9  trying to cut you off, but if he's not -- the 100, you're

10  asking him if he doesn't remember exactly and he uses 100,

11  isn't that weird?  And he's going, no, I think -- we're all

12  speculating as to what does it mean by using 100 if that's not

13  really what he meant.  So let's move on to something more

14  concrete.

15  **BY MR. JORDAN:**

16  **Q.**   We're talking about different time periods for different

17  individuals; isn't that true?

18  **A.**   We are talking about a lot of drugs over a long period of

19  time over to many different cities in the United States.

20  **Q.**   But, I mean, we're not talking about even numbered years

21  for each individual.  Sometimes it's three years, sometimes

22  it's two years, et cetera.  Isn't it true?

23  **A.**   For different individuals.  But for the Grimaldos, it's

24  with one investigation in 2004/2005 to the end of my

25  investigation where I arrested Efrain Grimaldo in 2012 and

WILLIAM LAWRENCE JOHNSON - CROSS

1  Sergio Grimaldo in 2013.

2  **Q.**   And wouldn't you admit that there's an overlap with

3  Mr. Wesley's testimony and the testimony of other individuals

4  relating to drugs, specifically, Mr. Talley?

5  **A.**   No, sir.

6  **Q.**   Because they both talk -- isn't it a fact that they both

7  talk about deliveries to the very same cities?

8  **A.**   Mr. Wesley stated that he had a customer in Houma,

9  Louisiana, at one time, and that he had the customer, the

10  customer wasn't a good customer, didn't pay on time, so he

11  never dealt with that customer.

12        At no time did Mr. Wesley say he provided cocaine to

13  Mr. Talley.  And at no time did Mr. Talley say he received

14  cocaine from Mr. Wesley.  Whoever Mr. Wesley's customer in

15  Houma, Louisiana, was at the time, I don't know who that was.

16  Mr. Talley doesn't know who that was.  Mr. Wesley can't say who

17  that was.  So it does not -- it does not intersect with

18  anything that Mr. Talley speaks of.

19  **Q.**   But it is a fact that both of them talked about deliveries

20  to the same parts of the country; isn't it true?

21  **A.**   Mr. Talley and Mr. Wesley both talked about Houma,

22  Louisiana.

23  **Q.**   Now, there were witnesses who talked about deliveries to

24  Alabama and Florida?

25  **A.**   That is correct.

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  **Q.**    And there was more than one witness who talked about that;
2  isn't that true?
3  **A.**    Mr. Wesley spoke of Pensacola; Jackson, Mississippi; and
4  Memphis, Tennessee; and Houston, Texas.  David Garza spoke of
5  Houston, Texas, and Houma, Louisiana.  Aldo Perez spoke of
6  Houma, Louisiana.  Sabino spoke of Houma and Houston, Texas.
7  So some of them may have been in the same cities, but at no
8  time did any of them say they were the same customers, or at
9  least at the same time.
10  **Q.**    And you're saying that that's simply a coincidence that
11  we're talking about the same parts of the country?
12  **A.**    Well, sir, I mean, a city like Pensacola, Florida, or
13  Houston, Texas, people may have customers in those cities, but
14  I'm sure there's a lot of -- especially in, say, a city like
15  Houston, Texas.  I mean, I'm sure there's several drug
16  traffickers that have several different customers in that one
17  city.  It's not like a small town.
18  **Q.**    But you don't know for a fact whether they're talking
19  about the same customers or not; isn't that true?
20       **MR. MURPHY:**  Your Honor, objection.  This has been
21  asked and answered now a couple of times.
22       **THE COURT:**  It has been asked and answered.
23       **MR. JORDAN:**  I'll move on, Your Honor.
24  BY MR. JORDAN:
25  **Q.**    Okay.  Now, you testified about another estimate of

WILLIAM LAWRENCE JOHNSON - CROSS

1  520 kilos a year; isn't that true?
2  A.   Yes, sir.
3  Q.   And that's kilos of cocaine?
4  A.   Yes, sir.
5  Q.   And you base that on what?
6  A.   I base that on the individual statements to FBI agents in
7  Mobile, Alabama.
8  Q.   And, again, these are individuals who began to cooperate
9  with the government after they were arrested; is that correct?
10 A.   That is correct, sir.
11 Q.   And that's true of all of -- basically, the lion's share
12 of the evidence here is based upon what I just said; isn't that
13 true?  Individuals who have been arrested and were now
14 cooperating with the government and providing information?
15 A.   Yes, sir.
16 Q.   And you would admit that you didn't discover -- there was
17 a ledger, but you didn't discover any ledgers giving you any
18 meaningful information about the number of deliveries or
19 amounts of money that were involved in their various
20 transactions?
21 A.   There was a ledger from Mr. Garza, yes, sir.
22 Q.   But beyond that, that's all that you had?
23 A.   That was the only ledger we recovered, yes, sir.
24 Q.   Now, as far as -- as far as leadership is concerned, you
25 conclude that Mr. Efrain Grimaldo was a leader based in part on

WILLIAM LAWRENCE JOHNSON - CROSS

1    the fact that he was a supplier?
2    **A.**    Yes, sir.  Him and his brother, yes, sir.
3    **Q.**    Now, you understand that there is a difference between a
4    supplier and a leader, do you not?
5    **A.**    I do, sir.
6    **Q.**    And, yet, you still testified that Mr. Efrain Grimaldo was
7    something more than a supplier?
8    **A.**    Yes, sir.
9    **Q.**    Now, isn't it a fact that several of these other
10   individuals in this case were simply independent contractors?
11   They were making their own money and they did not have to do
12   anything other than pay Mr. Grimaldo --
13              **THE COURT:**  What do you mean?  Independent contractor
14   is a legal term.  I mean, what are you trying to say?  They
15   weren't co-conspirators?
16              **MR. JORDAN:**  They were not -- they were not working
17   for him.
18              **THE COURT:**  Oh, okay.
19              **MR. JORDAN:**  They were not employees.
20              **THE COURT:**  We're not talking about legal employees
21   here, anyway.  Are you talking about --
22              **MR. JORDAN:**  Well, for the purpose of leadership, but
23   it is important, I think.
24              **THE COURT:**  I understand.  But I'm trying to
25   understand what you're trying to establish.  Are you trying to

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  establish independent contractor in the way that I understand
2  it, which is a legal term, or are you using roughly they were
3  independent operators?
4          MR. JORDAN:  Independent operators.
5          THE COURT:  And weren't taking direction from the
6  defendant?
7          MR. JORDAN:  Yes.
8          THE COURT:  Okay.  Gotcha.
9          MR. JORDAN:  The latter.
10          THE COURT:  Okay.  Gotcha.  Gotcha.  Okay.  Let's
11  proceed.
12          THE WITNESS:  Mr. Grimaldo and his brother were in
13  control.  Obviously, they had people who worked underneath them
14  that they paid, people like Mr. Duarte, people like Mr. Perez.
15  They also had people that they supplied drugs to.  That, as I
16  interpreted in all my years of doing this, as it comes to a
17  hierarchy are underneath Mr. Grimaldo, both Sergio and Efrain
18  Grimaldo.
19          These gentlemen are the ones that dictated the
20  price.  These gentlemen are the ones that dictated when
21  shipments would be delivered.  They were in control of the
22  individuals beneath them.  To me those are organizers and those
23  are leaders of an organization.  And that is what Efrain and
24  Mr. Sergio Grimaldo did.  They controlled the supply coming in;
25  they controlled the price of drugs going to their customers.

WILLIAM LAWRENCE JOHNSON - CROSS

1          Now, if their customers weren't getting drugs

2   from them and sourced off someone else, as you say, as an

3   independent, very possible.

4          But an organizer and a leader is someone that

5   controls multiple people, how much are the price of their drugs

6   that they're going to sell it for, and the supply, and when

7   it's coming in, and how it's done, and directing others to do

8   so.  And that's what Mr. Efrain and Mr. Sergio Grimaldo did,

9   and did for a long period of time.

10  BY MR. JORDAN:

11  Q.   Now, you say that Mr. Efrain Grimaldo controlled these

12  individuals, but isn't it a fact that, for example, Mr. Garza

13  was obtaining drugs from multiple sources?

14  A.   Mr. Garza, yes, he was.  Absolutely.

15  Q.   And he was free to obtain drugs from anyone he wanted to

16  and was not controlled by Mr. Efrain Grimaldo; isn't that a

17  fact?

18  A.   I mean, did Mr. Garza walk away from the deal?  I'm sure

19  he could have.  But at the time, he was being sourced by the

20  Grimaldo brothers.  They would determine how much the cocaine

21  was, where it was to be delivered.  They were in a leadership

22  and organizer role, and that's what they did -- I'm sorry.  Go

23  ahead.

24  Q.   And, Special Agent Johnson, you say that the Grimaldo

25  brothers determined the price.  But isn't it true that each of

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - CROSS

1  the individuals who received drugs allegedly from the Grimaldo

2  brothers was at liberty to charge whatever he or she decided to

3  charge for those drugs as long as they paid the Grimaldo

4  brothers whatever, based on what you're saying?

5  A.   Well, in order to make a profit, absolutely.

6  Mr. Grimaldo -- both of the Grimaldo brothers, once they got

7  their drugs from their supplier who controlled their profit and

8  whoever was organizing them, they did the same thing to those

9  underneath them.

10          And, obviously, if you're buying something for

11  $30,000 a kilo, if you're trying to make a profit, you're going

12  to add that tax and you're going to sell it for 32, 33 a kilo.

13  That's how the drug game works.

14  Q.   But my point is, it's not fair to say that Mr. Efrain

15  Grimaldo determined the price on the drugs that were sold by

16  Mr. Wesley, is it?

17  A.   Absolutely it's fair to say it.  At least to the drugs

18  that they're selling to Mr. Wesley.  Absolutely.  And that's

19  forcing Mr. Wesley to have to raise his price to make his own

20  profit.  It's more than fair to say that Mr. Efrain Grimaldo

21  and Sergio Grimaldo controlled the price of the cocaine they

22  sold.

23  Q.   Isn't it a fact that Mr. Efrain Grimaldo, based on the

24  testimony at the trial, did not tax individuals for the alleged

25  privilege of buying drugs from him?

WILLIAM LAWRENCE JOHNSON - CROSS

1  **A.**   I don't recall that in any testimony, Mr. Jordan.

2  **Q.**   No, that didn't happen?

3  **A.**   I don't recall anyone --

4        **THE COURT:**  I don't know what that means.

5        **THE WITNESS:**  I don't recall anyone saying that he

6  didn't tax it.  I'm sure Mr. Grimaldo wasn't in the business to

7  break even.

8  **BY MR. JORDAN:**

9  **Q.**   Well, my point is, again, control and supervision and --

10 **A.**   Correct.

11 **Q.**   -- and there are basically two individuals that the

12 testimony suggested that Mr. Efrain Grimaldo arguably had

13 control over and that was Mr. Duarte and Mr. Perez.  Those were

14 two drivers.  But he had no control over anyone else; isn't

15 that true?

16 **A.**   Mr. Talley.  At one time, Mr. Garza.  And at one time,

17 Mr. Wesley.  That would be five people just in the court of

18 record -- just in the trial record that both Efrain and Sergio

19 Grimaldo had control over.

20 **Q.**   Well, in fact, they never -- those individuals never

21 served as his drivers; isn't that true?

22 **A.**   No, sir.  They served as their customers.

23 **Q.**   Customers only?

24 **A.**   Uh-huh.  Yes.

25 **Q.**   And I'll make the argument about whether -- the

WILLIAM LAWRENCE JOHNSON - CROSS

1   significance of that.

2           **THE COURT:**  You're doing a lot of arguing right now,

3   so you got to move on.

4           **MR. JORDAN:**  Okay.  We're going to move on.

5   **BY MR. JORDAN:**

6   **Q.**   Now, in fact, Mr. Grimaldo -- Mr. Efrain Grimaldo, there's

7   nothing in the trial transcripts that indicates that he

8   identified specific customers to buy cocaine from Mr. Wesley or

9   Mr. Talley or Mr. Garza.  Those individuals -- those customers,

10  were identified by those individuals, Mr. Wesley, Mr. Talley,

11  and Mr. Garza; isn't that true?

12  **A.**   Mr. Wesley had customers he sold to, as did Mr. Talley.  I

13  know that for a fact that once, say, Mr. Talley was arrested,

14  that Mr. Grimaldo instructed Perez-Marquez to go to the next

15  person there so they could keep the business in Houma.

16          So did they meet directly with who, say, Lester

17  Talley was dealing with?  I have no evidence to that fact, sir.

18  No, sir.

19  **Q.**   And, in fact, not only did he not meet with these people,

20  he never -- you have no reason to know -- believe that he even

21  knew those individuals; isn't that true?

22  **A.**   At the level that Mr. Grimaldo is on, he commonly wouldn't

23  meet those people, Mr. Jordan.  Efrain Grimaldo and Sergio

24  Grimaldo are at a much higher level of the drug trafficking

25  scheme pyramid than, say, someone dealing on the corner of

OFFICIAL TRANSCRIPT

1   "Walk and Don't Walk."  Mr. Grimaldo wouldn't meet those

2   everyday street dealers.  That's not the level Mr. Grimaldo is

3   at.

4           Mr. Grimaldo meets with the people bringing hundreds

5   of thousands of dollars in U.S. currency to buy 30, 40,

6   100 kilos of cocaine.  That's the level that Mr. Grimaldo is

7   on.  It is two separate levels.  He wouldn't meet with people

8   like that.

9   Q.   And would you agree that if Mr. Grimaldo -- Mr. Efrain

10  Grimaldo is not present, there's not necessarily -- you don't

11  necessarily have information that he's involved in that

12  particular drug transaction; isn't that true?

13          THE COURT:  I think we've had the not present

14  question several times now.

15          MR. JORDAN:  Okay.  We talked about that.

16              I'm just about done, Your Honor.

17          THE COURT:  Okay.

18  BY MR. JORDAN:

19  Q.   And you talked about what's a conservative estimate versus

20  one that is not conservative.

21  A.   Yes, sir.

22  Q.   Isn't it a fact that as far as the -- that the Perez,

23  Duarte, Talley transactions, the 100 kilos of cocaine --

24  A.   Yes, sir.

25  Q.   -- isn't it a fact that you did not discount that figure?

WILLIAM LAWRENCE JOHNSON - CROSS

1   You simply -- you did not -- here it is.  You did not come up
2   with a reduced figure for that.  You simply accepted the
3   100 kilos that they talked about.  You didn't reduce it further
4   to come up with a more conservative estimate for that?
5   **A.**   Mr. Jordan, 100 kilos was, in my opinion, if we're talking
6   just my opinion, was way too low.  But we went with
7   conservative numbers.
8   **Q.**   Well, that's the figure that they gave you, isn't it?
9          **THE COURT:**  Well, one of them said at least 100.
10         **MR. JORDAN:**  Yeah.  He said 100 --
11         **THE WITNESS:**  They said -- Mr. Perez said at least
12   100.
13         **THE COURT:**  No.  He said it was at least 100.
14         **THE WITNESS:**  As did Mr. Talley say at least 100.
15   I -- I mean, like I said, I think that is very low and very
16   conservative.
17   **BY MR. JORDAN:**
18   **Q.**   And you would admit that all of this -- this is not a
19   science -- all of this -- these are estimates.  In almost every
20   instance, we're talking about estimates; wouldn't you agree?
21   **A.**   Yes, sir, I would agree to that.
22         **MR. JORDAN:**  No other questions, Your Honor.
23         **THE COURT:**  Thank you.
24         **MR. MURPHY:**  Your Honor, a little bit of redirect.
25

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1        **REDIRECT EXAMINATION**
2   **BY MR. MURPHY:**
3   **Q.**   I want to go to the middle of Mr. Jordan's
4   cross-examination of you and then go back to the beginning.
5   **A.**   Yes, sir.
6   **Q.**   But I think it is important to clarify whether Mr. Efrain
7   Grimaldo was merely present or was actively involved as it
8   relates to Mr. Chapa.
9             Now, I'm showing on the ELMO the transcript from day
10  two, page 18 [SIC], beginning on line 6, and then I'll be going
11  over to page 19 [SIC].  I'm not going to read it out loud, but
12  I do reference that all of page 218 beginning at line 6.
13            Does this indicate to you in the testimony, and does
14  it support your investigation, that Mr. Chapa had direct
15  dealings with David Garza?
16  **A.**   Yes, sir, he did.
17  **Q.**   And what did your investigation reveal in that regard?
18  **A.**   That Chapa, or Salvador Obiendo, at one time directly
19  supplied David Garza, and David Garza directly supplied Sergio
20  Grimaldo and Efrain Grimaldo.
21            And at some point, according to Mr. Garza, around
22  2007 that relationship changed.  Mr. Garza started sourcing
23  directly from Efrain and Sergio Grimaldo.  We later learned in
24  the investigation that Efrain and Sergio Grimaldo then began
25  sourcing directly from Salvador Obiendo until the time of his

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1    passing.

2    **Q.**   All right.  And just looking at part of 19 -- 219 going

3    from lines 1 through 8, does that indicate that Mr. Efrain

4    Grimaldo is simply merely present in providing drugs to David

5    Garza?

6    **A.**   No, sir, it's not.

7    **Q.**   What does it indicate?

8    **A.**   It indicates Sergio Grimaldo and Efrain Grimaldo were

9    equal partners in the drug distribution business.

10   **Q.**   All right.  Now, going back to the beginning of the direct

11   examination -- or the cross-examination, rather, you have

12   17 years of law enforcement experience involving the

13   investigation of drug dealers.  Is it common that you arrest

14   large-scale drug dealers with little or no drugs, little or no

15   cash, or little or no valuable assets?

16   **A.**   Depending on how high they are up on the hierarchy, it is

17   very rare that you get fortunate enough to seize large amounts

18   of drugs from those types of individuals --

19   **Q.**   And based on your own investigative --

20            **THE COURT:**  Let him finish his answer because you

21   talked over him.

22            **MR. MURPHY:**  Your Honor?

23            **THE COURT:**  You talked over him and I didn't hear the

24   end of his answer.

25            **MR. MURPHY:**  I apologize.  Your Honor, I should note

WILLIAM LAWRENCE JOHNSON - REDIRECT

1  that I have a hearing loss.

2         **THE COURT:**  I know.  I know.

3         **THE WITNESS:**  But, basically, it is very rare that an

4  individual at their level, that you will catch them with the

5  drugs.  That is why they have people like the Aldo Perezes, the

6  Sabino Duartes, and John Wesleys that actually will then put

7  their hands on the drugs and deliver them to these cities.

8  They call the shots.  They organize.  The people underneath

9  them actually handle the drugs.

10 **BY MR. MURPHY:**

11 **Q.**  All right.  Was there corroborative evidence that was

12 useful in your investigation introduced at trial that

13 corroborated large-scale drug dealing such as photos?

14 **A.**  Yes, sir.

15 **Q.**  And what did those photos show, and how did they

16 corroborate large-scale drug dealing to you as an investigator

17 in this case?

18 **A.**  Just photos of Mr. Grimaldo with large sums of cash, with

19 what appeared to be expensive jewelry, which then we

20 corroborated with witness statements and testimony, large

21 high-end vehicles like HUMVs and other numerous vehicles.

22 Again, things that show wealth -- extreme wealth.

23         And especially at the -- not just that, but

24 especially at the level that Mr. Grimaldo is on, the ability to

25 have the money to have your fingerprints altered to avoid

1   detection, to purchase documents under other people's names and

2   social security numbers to obtain driver's licenses.

3        Those are things done by people who want to stay

4   hidden, who don't want to be out in the light and that are

5   trying to protect the wealth and protect who they are, which

6   is -- once again, demonstrates a higher level and a higher

7   sophistication of drug trafficker than your normal street drug

8   trafficker.

9   **Q.**   Did some of those photographs depict, in your

10  investigative view, expensive watches?

11  **A.**   Yes, sir, it did.

12  **Q.**   Did they depict diamond encrusted jewelry, including a

13  diamond encrusted cross?

14        **MR. JORDAN:**  Your Honor, I'm going to object to that

15  because he doesn't know whether they're diamonds or not.  It's

16  just -- I mean...

17        **THE COURT:**  He can -- I think we went over this at

18  trial.  Why don't you move on because that's not really that

19  impressive.

20        **MR. MURPHY:**  All right.  There is one photo that

21  wasn't mentioned that I would like to get into, Your Honor.

22  There's been no testimony on this.

23  **BY MR. MURPHY:**

24  **Q.**   Is one of the pieces of corroboration a photo where you

25  found where the fingerprints of the defendant appeared to be

WILLIAM LAWRENCE JOHNSON - REDIRECT

1   obliterated?

2   A.    Yes, sir.

3   Q.    And what did that mean to you as an investigative agent?

4   A.    Along with the numerous false IDs that I knew Mr. Grimaldo

5   had obtained, obviously, the Louisiana ID, one ID that we

6   discovered in Arizona that was not brought up in trial, that

7   and the attempt to manipulate his fingerprints showed that

8   Mr. Grimaldo was wanting to be able to move freely between

9   Mexico and the United States without being detected.

10  Q.    All right.  Regarding the similarity of the testimony,

11  were these defendants -- or co-conspirators, who are all listed

12  on that chart, were they all interviewed and prepared

13  separately and apart from each other?

14  A.    Yes, sir, they were.

15  Q.    Many of those interviews were done with myself and my

16  co-counsel, Ted Carter; is that right?

17  A.    Yes, sir, they were.

18  Q.    And did we scrupulously follow a rule that we didn't

19  question them together?

20  A.    That is correct.

21  Q.    Let me turn to the issue of control.  And I'm going to

22  annotate my chart a little bit and ask you to explain it.  And

23  I'm also going to reference my sentencing memo, page 3,

24  Footnote 1, the last sentence in that.

25        Were there a group of individuals, including Aldo

WILLIAM LAWRENCE JOHNSON - REDIRECT

1   Perez, Sabino Duarte, Lester Talley, and also a person not on

2   that chart, Tio, that all worked collectively in the

3   distribution of drugs?

4   A.   Yes, sir.

5   Q.   Were they under -- now, Tio is not listed in chart C; is

6   that correct?

7   A.   That is correct.

8   Q.   He's an uncharged co-conspirator; is that right?

9   A.   Yes, sir.

10  Q.   Were all four of those individuals under the direct

11  control and operational activity of drug dealing by Efrain

12  Grimaldo?

13  A.   Both Efrain and Sergio Grimaldo, yes, sir.

14  Q.   And what specifically would you point to to show that they

15  were under the direct operational control of Efrain and Sergio

16  Grimaldo?

17  A.   Well, their individual testimony, first and foremost.

18  That in the case you have Mr. Juan Carlos Garza -- I'm assuming

19  that's Juan Carlos Garza -- was directed by Mr. Efrain Grimaldo

20  to be introduced to Mr. Talley in order to instruct Mr. Talley

21  that the Grimaldos were now in charge and not Mr. Garza.

22  Q.   Now, Juan Carlos -- Juan Garza, rather --

23            Juan Carlos Garza is his full name; right?

24  A.   Yes, sir.

25  Q.   -- did not testify in the trial?

WILLIAM LAWRENCE JOHNSON - REDIRECT

1   A.   No, sir, he did not.

2   Q.   But he was part of your investigation?

3   A.   Yes, sir, he was.

4   Q.   Was he also under the direct control of Efrain Grimaldo?

5   A.   Yes, sir, he was.

6   Q.   And how was he under the direct control of Efrain?

7   A.   As a driver for the organization.

8   Q.   Did he receive instructions from Efrain?

9   A.   Yes, sir, he did.

10  Q.   So that's -- one, two, three, four -- five individuals

11  just there that are under the direct operational control of

12  Efrain Grimaldo?

13  A.   Yes, sir.

14  Q.   During the course of this charged conspiracy?

15  A.   That is correct.

16  Q.   Were they mere customers of Efrain Grimaldo?

17  A.   No, sir.

18  Q.   Why were they not mere customers?

19  A.   Because they actually -- well, they handled transportation

20  of both drugs and money and distribution of drugs for the

21  Grimaldo organization to -- at least that group there -- into

22  Houma, Louisiana.

23  Q.   Okay.

24       MR. MURPHY:  Your Honor, if I may have just a moment.

25

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1  BY MR. MURPHY:

2  Q.   I'd like to talk about David Garza and his wife Veronica

3  Garza for a moment.  David Garza had a relationship and then

4  switched that relationship with Efrain Grimaldo during the

5  course of your investigation; isn't that right?

6  A.   With Efrain and Sergio, yes, sir.

7  Q.   And how did that relationship first start between the

8  Grimaldos and David Garza?

9  A.   Based on what I recall from the testimony at the trial,

10 Mr. Garza and Mr. Sergio Grimaldo had a common customer.

11 Mr. Grimaldo -- Sergio Grimaldo starts talking business with

12 David Garza about David Garza's supplying him with cocaine.

13 The relationship started again with David Garza supplying

14 cocaine to Sergio Grimaldo.  And at some point in time,

15 approximately 2007, that relationship changed.

16         During the course of that relationship, Efrain,

17 Sergio, David Garza are in the same house, counting drug

18 proceeds, packaging drugs together.  At some point in time, how

19 it exactly happened is not known, but Efrain and Sergio

20 Grimaldo leapfrog, for lack of a better term, David Garza and

21 become directly related with Salvador Obiendo.  We have

22 numerous photographs of them together.  And then the Grimaldos

23 then start supplying drugs, kilograms of cocaine, to David

24 Garza.

25 Q.   So is it fair to say that David was at one point a

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1   supplier to both Grimaldos and then became a subordinate --
2   **A.**   Correct.
3   **Q.**   -- of both Grimaldos?
4   **A.**   Yes, sir.
5   **Q.**   Is that fair to say?
6   **A.**   Yes, sir.
7   **Q.**   And as a subordinate, was he under the control or
8   direction of the Grimaldos?  Was David Garza under the control
9   and direction of both Grimaldos when he became a subordinate?
10  **A.**   Yes, sir, he was.
11  **Q.**   And what facts would you put on the record to support
12  that?
13  **A.**   Mr. Garza's testimony, Mr. --
14            **THE COURT:**  What did he say?
15            **THE WITNESS:**  Ma'am?
16            **THE COURT:**  You said his testimony.  What did he say?
17            **THE WITNESS:**  That he was then under -- he was then
18  being supplied by -- excuse me -- Sergio and Efrain Grimaldo,
19  who at that time took his place with Salvador Obiendo, and so
20  then he had to go through the Grimaldos in order to get cocaine
21  to deliver to Houma, Louisiana.
22            And after David Garza's arrest, it was Efrain
23  Grimaldo who instructed David Garza's brother, Juan Carlos
24  Garza, to introduce him to Edward Talley so that the money that
25  was owed went back to the Grimaldos and that the Grimaldos

WILLIAM LAWRENCE JOHNSON - REDIRECT

1    would be supplying Mr. Talley with the cocaine.

2    **BY MR. MURPHY:**

3    **Q.**    And his wife, Veronica Garza, testified that she witnessed

4    both cocaine bricks and large amounts of cash in a stash house;

5    is that right?

6    **A.**    That is correct.

7    **Q.**    And she -- she testified that she traveled to Houma,

8    Louisiana, to deliver the drugs provided by the Grimaldos?

9    **A.**    She said that she took trips with her husband to Houma,

10    Louisiana, yes, sir.

11    **Q.**    And she had a particular role to play in the vehicle that

12    she drove on the trips to Houma, Louisiana, that she described;

13    isn't that right?

14    **A.**    Yes, sir, she did.

15    **Q.**    And what was that role?

16    **A.**    She stated that that role was -- she was in a separate

17    vehicle, and as they were traveling to Houma, if they saw a

18    police presence, law enforcement presence, a marked a unit, her

19    job was to start speeding in order to draw the officer out to

20    conduct a traffic stop, allowing the vehicles with the drugs

21    intended to Houma to be able to pass through.

22    **Q.**    And was that in direct support of the conspiracy to

23    distribute the drugs?

24    **A.**    It was in order to distribute the drugs, yes, sir.

25    **Q.**    And she witnessed Efrain Grimaldo move money and drugs

WILLIAM LAWRENCE JOHNSON - REDIRECT

1 || within the stash house?

2 || **A.**   She testified that Efrain Grimaldo was present with David

3 || Garza and Sergio Grimaldo as they counted money with drugs

4 || present.

5 ||            **MR. MURPHY:**  Your Honor, if I may have one more

6 || moment.

7 ||            Your Honor, we have nothing further.

8 ||            **THE COURT:**  Okay.  Thank you.

9 ||            Going back to this 520 kilos a year.  Now, what

10 || is the basis for that?

11 ||       **THE WITNESS:**  Yes, Your Honor.  It was based on

12 || interviews that FBI agents in Mobile had with Daron Jones.  He

13 || was one of the larger customers of the Grimaldo brothers.  He

14 || supplied the cities I had listed in the Midwest and off the

15 || East Coast.

16 ||            During his interviews with the FBI agents, he

17 || stated that he would receive anywhere between 5 to 15 kilos

18 || twice a week for approximately two years.  So what I did on the

19 || conservative -- to be conservative, I took the low number that

20 || Mr. Jones had stated, five kilos, twice a week is ten kilos,

21 || times 52 weeks a year, 520 kilos a year for approximately

22 || two years, 1,040 kilos.

23 ||            **THE COURT:**  This Jones person, these interviews were

24 || done by the FBI in Mobile?

25 ||            **THE WITNESS:**  Yes, ma'am.

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1    **THE COURT:**  Did you read the interviews, or did you
2   get this word of mouth from them?
3    **THE WITNESS:**  At first when I -- prior to -- when I
4   spoke with the individual at Probation and Parole for the PSI,
5   I had only done a telephonic interview with the agents.  They
6   have later sent me the reports based on those interviews, and I
7   did review those reports.
8    But my statement to Probation and Parole was
9   prior to those -- was prior to receiving those reports, but I
10  have received those reports since then.
11   **THE COURT:**  Okay.  What is this Jones person's first
12  name?
13   **THE WITNESS:**  Daron, D-A-R-O-N.
14   **THE COURT:**  All right.  And you said something about
15  $10 to $12 million.  What was that in reference to?
16   **MR. MURPHY:**  Your Honor, I can provide a specific
17  reference to you in the memo which cites the transcript.  It is
18  for the testimony of John Wesley.  If you turn to page 7 of the
19  government's sentencing memorandum.  The very first quoted
20  section says:
21   "Q.  So what are we talking about?
22   "A.  What is that?
23   "Q.  We're talking about millions of dollars, aren't
24      we?
25   "A.  $10 million, $12 million, like that."

OFFICIAL TRANSCRIPT

WILLIAM LAWRENCE JOHNSON - REDIRECT

1              That's John Wesley's testimony.

2              THE COURT:  Okay.  Now, does that convert to

3    500 kilograms?  Are those equivalent?  Is that the street

4    value?

5              MR. MURPHY:  It does, Your Honor.  In fact, you can

6    even look at the transcript to show you the conversion.  If you

7    go to the very beginning --

8              THE COURT:  Okay.  That's all I need to know.  Okay.

9              MR. MURPHY:  Okay.

10             THE COURT:  All right.  That's fine.

11             THE WITNESS:  Your Honor, if I may.  I believe

12   Mr. Wesley even states the number 500 at --

13             THE COURT:  He does say 500.  I'm just trying to

14   correlate it with the --

15             THE WITNESS:  -- at $20,000 a kilo, I believe, he

16   stated.

17             THE COURT:  Okay.

18             MR. MURPHY:  Right.  His first answer on page 7 of

19   the excerpted transcript explains how the 500 is converted from

20   the dollar amount.

21             THE COURT:  Okay.  Let's take a five-minute break

22   before we come back and I'll rule on these objections.

23             THE DEPUTY CLERK:  All rise.

24             (WHEREUPON, the Court took a recess.)

25             THE DEPUTY CLERK:  All rise.

OFFICIAL TRANSCRIPT

1   **THE COURT:**  All right.  Be seated.

2   Before I resolve these objections, do you all

3   want to say anything on the objections, not on the overall

4   sentence, not on anything mitigating, but just the legal issues

5   involved in the objections?

6   **MR. JORDAN:**  Judge, on behalf of the defense, I would

7   simply underscore the fact that the agent testified that these

8   were all estimates, and he indicated that they're conservative.

9   He indicated that they were based upon what he believed to be

10  verified information or confirmed information.  In fact, what

11  he indicated for the most part is that the persons who verified

12  this information were inmates, were cooperating individuals.

13  There are no ledgers in this case.  There's no

14  substantial amount of money.  There's no substantial amount of

15  drugs.  That would all suggest to me, Your Honor, that the

16  estimates are grossly exaggerated and excessive.

17  In addition to that, I would also point out the

18  fact that there seems to be a lot of overlapping here.  The

19  agent did concede that there is some overlapping, but I believe

20  that there's more overlapping.  The agent is really not in a

21  position to draw distinctions and say this is separate and

22  apart, and this has nothing to do with this, simply because

23  there's so many individuals involved in these deliveries, and

24  that's the way the testimony emerged in this case.

25  So my point is that there is very little in the

1  way of corroborative evidence here as to the estimates, and
2  there's overlapping.  And as far as leadership is concerned, I
3  think that the agent continued to come back to the point that
4  Mr. Efrain Grimaldo is a supplier and that these are customers
5  that he's talking about.  So that is not consistent with the
6  conclusion that Mr. Efrain Grimaldo was in control or
7  supervising these individuals.
8           And there was very little in the way of
9  testimony on his part or other individuals indicating that
10  people felt that they were under his -- under Mr. Efrain
11  Grimaldo's control and that they had no free will in what they
12  did with regard to drug transactions.  In fact, they had lots
13  of liberty.  And there were only two individuals, I believe,
14  who were indicated as actual drivers during the actual trial.
15           That's my argument, Your Honor.
16        **THE COURT:**  Thank you, sir.
17        **MR. MURPHY:**  Your Honor, the government believes that
18  the Court can find 150 kilograms or more involved in this
19  conspiracy and directly attributable to this defendant and that
20  there's corroboration of that, and that he controlled five or
21  more individuals.
22           On the seized amounts, we introduced many photos
23  during the trial.
24        **THE COURT:**  I've got it.  I've heard a lot about
25  this.  I know what the state of the record is.  I heard what

1  you had to say this afternoon.  I just have to make a call on

2  it.

3          MR. MURPHY:  If I could just talk to the leadership

4  issue, though, Your Honor.  Even if you take David Garza out of

5  the equation -- although I think there's plenty of facts in the

6  record to support that he became a subordinate of the

7  Grimaldos, both of them -- you certainly have Aldo Perez,

8  Sabino Duarte, and Lester Talley, an uncharged person named

9  Tio, and Juan Carlos.  That gets you to five.

10          THE COURT:  Doesn't it include him, too?

11          MR. MURPHY:  And it includes himself.  That's right.

12  And it includes his brother, Sergio.  So I think we've met the

13  requisite number.  And without beating a dead horse, there's

14  very adequate facts in the record of how he made phone calls,

15  he directed them when to go, how much to go, he was at the

16  stash house, he had the money, he was counting the money, there

17  was counting money machines.  He was running the operation.

18          When you listen to the phone calls, that's

19  particularly clear on how in charge he was on the one occasion

20  where we captured him in a controlled buy.  You can debate

21  whether it's 1600 or 700.  What I think seems to be absolutely

22  convincing is that it's 150 or more, and that he controlled an

23  organization of five or more people in which he was directing

24  large-scale, international, cartel-connected drug dealing.

25  That's the top of the pyramid.  The government has put on

1    sufficient evidence, we believe, to support that.

2              THE COURT:  All right.  Thank you.

3                   All right.  I'm going to resolve the objections.

4                   In determining facts relevant to sentencing, a

5    District Court may consider any information which bears

6    sufficient indicia of reliability to support its probable

7    accuracy, including hearsay evidence, without regard to

8    admissibility under the Federal Rules of Evidence.

9                   Ordinarily, a PSR bears sufficient indicia of

10   reliability to be considered as evidence by the sentencing

11   judge when making factual determinations.  It is well settled

12   that a District Court may adopt the facts contained in a PSR

13   without further inquiry if those facts have an adequate

14   evidentiary basis with sufficient indicia of reliability and

15   the defendant does not present rebuttal evidence or otherwise

16   demonstrate that the information in the PSR is unreliable.

17                   A defendant challenging information presented at

18   sentencing bears the burden of demonstrating its untruth,

19   inaccuracy, or unreliability.  Nevertheless, valid

20   conclusionary statements do not acquire the patina of

21   reliability by merely including them in the PSR.

22                   At the same time, the District Court is not

23   limited at sentencing to the findings in the PSR and the

24   evidentiary bases.  Therefore, a District Court may corroborate

25   its factual findings with evidence received during a sentencing

1    hearing, such as the one held today, and as well as with

2    testimony from trial in the same case.

3            While ruling on each objection, the Court will

4    specify the sources and materials that support its factual

5    findings in connection with the objection.

6            Number one, arrest date.  The defendant's first

7    objection is that the PSR reflects an inaccurate date for his

8    arrest.  The defendant claims that he was arrested on

9    July 18th, 2012.  The PSR states he was arrested on

10   December 21st, 2012.

11           The defendant was arrested on July 17th, 2012,

12   in Harris County, Texas, on an unrelated aggravated kidnapping

13   charge.  He was released from state custody on that charge on

14   December 21st, 2012, at which point he was arrested by federal

15   officials and taken into federal custody.  The defendant's

16   federal arrest in the Southern District of the Texas appears in

17   the CMECF electronic docket for this case as entry 53.

18           As is reported in the addendum to the PSR, the

19   probation officer relied upon this information from CMECF as

20   well as information from the Harris County Jail in Houston when

21   drafting this portion of the report.  The Court finds that the

22   presentence investigation report reflects the correct date for

23   defendant's federal arrest on this charge and so the

24   objection's overruled.

25           Two, aliases.  The defendant objects to the

1    presence report's citation to two aliases of his, Palma and
2    Efrain Garza.  He contends that he never used these aliases.
3    Probation based the citation to these aliases on defendant's
4    FBI rap sheet and on a DEA investigative report from the
5    discovery information.
6              The Court concludes that these sources bear
7    sufficient indicia of reliability to form the basis of this
8    fact finding and overrules the objection.
9              Criminal history points for sexual assault
10   conviction.  Third, the defendant objects to the three criminal
11   history points assigned to him under Section 4A1.1(a) of the
12   guidelines for his sexual assault conviction.  The defendant
13   contends that although he received this conviction as an adult,
14   he was 17 at the time of his arrest, and, therefore, at the
15   time of the underlying conduct.
16             He argues that he should have been prosecuted in
17   juvenile court, and that the attorneys for the state pursued
18   more serious charges with the goal of obtaining a conviction
19   after he obtained the age of majority.  Thus, he contends his
20   conviction should be treated as a juvenile conviction.
21             The sentencing guidelines Application Note for
22   Section 4A1.1(a) provides:  "A sentence imposed for an offender
23   committed prior to the" -- "for an offense committed prior to
24   the defendant's 18th birthday is counted under this subsection
25   only if it resulted from an adult conviction."

OFFICIAL TRANSCRIPT

1            The note does not provide a definition of an

2     adult conviction, but it refers to Section 4A1.2(d) which

3     applies to offenses committed prior to age 18.  That section

4     provides:  "If the defendant was convicted as an adult and

5     received a sentence of imprisonment exceeding one year and one

6     month, add three points under Section 4A1.1(a) for each such

7     sentence."

8            In the defendant's own objection, he admits he

9     was convicted as an adult.  For his conviction, he received a

10    sentence of two years of imprisonment.  Accordingly, the Court

11    finds the three points are correctly awarded under

12    Section 4A1.1(a).  This objection is overruled.

13           The defendant -- number four -- objects to

14    certain factual information about his parents.  The draft

15    report recorded his father's age as 60.  He's actually 64.  And

16    he reported his mother's disability left her unable to walk and

17    she's since recovered her ability to walk.  The final report

18    corrects this information, so there's no reason to rule on this

19    objection.

20           The next objections go to quantity.  There are

21    nine objections.  Five through 13 are to certain factual

22    findings in paragraphs 9, 10, 13, 14, 18, 20, 22, 23, and 26 of

23    the PSR.  Because these objections overlap substantially, the

24    Court groups them together for analysis.

25           The defendant maintains he was not a member of a

cocaine distribution ring, he was not the main source of supply
in a drug conspiracy, he was not a supplier of cocaine, he did
not distribute cocaine in the Eastern District of Louisiana or
any other district, and he is not responsible for the quantity
of cocaine attributed to him in these paragraphs.

In addition, the defendant's 14th objection is
to the basis for the PSR's fact finding as to the total drug
quantities attributable to him.  The basis for the PSR's
quantity findings is set forth in paragraphs 34 through 37 of
the report.  In essence, the PSR found that there was at least
1600 kilograms of cocaine involved in the conspiracy.

Under the sentencing guidelines, the base
offense level for a defendant convicted of a drug offense is
determined based on the amount of drugs involved.  The quantity
includes the drugs for which the defendant is directly
responsible and the drugs that can be attributed to him in a
conspiracy as relevant conduct, which would include all
reasonably foreseeable quantities of cocaine that were within
the scope of the criminal activity that he jointly undertook.

In addition, the quantity incorporates both the
quantities for which the defendant is responsible that were
part of the offense of conviction, as well as those that were
part of the same course of conduct or common scheme or plan as
the offense of conviction.

Application Note 5(B) to Section 1B1.3 of the

1   sentencing guidelines provides that the following factors are

2   relevant to determining whether offenses are sufficiently

3   connected or related to each other to be considered as part of

4   the same course of conduct:  The degree of similarity of the

5   offenses, the regularity, repetitions of the offense, and the

6   time interval between the offenses.

7           Application Note 5 to Section 2D1.1 of the

8   sentencing guidelines provides:  Where there are no drugs

9   seized or the amount seized does not reflect the scale of the

10  offense, the Court shall approximate the quantity of the

11  controlled substance.  In making the determination, the court

12  may consider similar transactions and controlled substances by

13  the defendant.

14          In other words, the amount of drugs attributable

15  to a defendant for purposes of sentencing may not be limited to

16  the actual quantity seized.  The district judge can make an

17  estimate.  In *Betancourt*, 422 F.3d 240, the Fifth Circuit

18  approved the District Court's estimation of drug quantity based

19  on an extrapolation from evidence adduced at trial.

20          The Court conducted a three-day trial in this

21  case and has heard testimony today from the case agent, Larry

22  Johnson, about his broader investigation of defendant's drug

23  trafficking activities.

24          In addition, the Court has reviewed the quantity

25  findings in the PSR and the transcript from the trial.  Based

OFFICIAL TRANSCRIPT

1    on these materials, the Court concludes that the agent's

2    quantity estimate of 1600 kilograms is reasonably attributable

3    to the defendant because it bears a sufficient indicia of

4    reliability to form the basis of the Court's quantity

5    determination.

6              First, the Court addresses defendant's

7    contention that he was not a member of a cocaine distribution

8    ring.

9              Defendant was convicted at trial by a jury of

10   one count of conspiring to distribute and to possess with the

11   intent to distribute five kilograms or more of cocaine

12   hydrochloride.

13             The government had to prove defendant's offense

14   beyond a reasonable doubt.  The defendant's conviction for

15   conspiring to distribute and to possess with the intent to

16   distribute cocaine undermines his contention that he was not a

17   member of a cocaine distribution ring.  This factual objection

18   is overruled.

19             Second, the Court addresses defendant's

20   contention he did not distribute cocaine in the Eastern

21   District of Louisiana or any other district.

22             At trial, the government elicited testimony from

23   numerous witnesses indicating that the conspiracy distributed

24   cocaine throughout Southeastern Louisiana, including in

25   particular Terrebonne Parish.  Accordingly, this factual

1    objection is overruled.

2              Third, the Court addresses defendant's

3    contention that he was not the main source of supply in a drug

4    conspiracy and that he was not a supplier of cocaine.

5              At trial, the government elicited testimony from

6    numerous witnesses indicating that defendant was a major

7    supplier of cocaine and that he provided his customers with

8    quantities of cocaine ranging from a half a kilogram to

9    20 kilograms of cocaine at a time.  Accordingly, this factual

10   objection is overruled.  And that's trial transcript, day two,

11   at page 189 and at page 99.

12             Fourth, the Court addresses the quantity

13   objections.  These are defendant's objections that he's not

14   responsible for the quantities of cocaine attributed to him in

15   paragraphs 13, 14, 18, 20, 22, 23, or 26 of the PSR or the

16   greater estimated quantity of 1600 kilograms attributed to him

17   at paragraph 37 of the PSR.

18             If the Court determines that the defendant was

19   responsible for 150 kilograms or more of cocaine hydrochloride,

20   then the defendant is subject to a base offense level of 38.

21   Thus, the critical question is whether the quantity of cocaine

22   hydrochloride attributable to the defendant meets or exceeds

23   150 kilograms.  If it does, then the calculations in the PSR,

24   which are based on a base offense level of 38, are correct.

25             The Court holds that the quantities attributable

OFFICIAL TRANSCRIPT

to the defendant as demonstrated by the government at trial and
at this hearing far exceed 150 kilograms and are reasonably
estimated at 1600 kilograms.

In its memorandum on sentencing, the government
adopted a conservative approach to estimating quantities
established by the trial testimony of different witnesses.
Specifically, the government counted the quantities identified
by witnesses Aldo Perez-Marquez, Sabino Duarte, and Lester
Talley only once as these three witnesses likely testified to
the same quantities in at least some instances.  The Court
agrees with the government's approach as to these three
witnesses and, therefore, counts the quantities identified by
them once.

The Court finds that through the combined
testimony of Perez-Marquez, Duarte, and Talley, the government
established that the defendant was responsible as the supplier
for at least 100 kilograms.

The next important witness for quantity is John
Wesley.  The defendant argues that Wesley's trial testimony was
not credible.  The Court finds, however, that Wesley's
testimony regarding quantity was credible.

Wesley's testimony clearly indicated that he
distributed and transported cocaine for the defendant.
According to his testimony, Wesley arranged for the transport
of cocaine from defendant's stash house in Houston to locations

OFFICIAL TRANSCRIPT

such as Memphis, Jackson, and Pensacola.  Five to ten kilos of cocaine were transported per trip.  He estimated at trial that 500 kilograms of cocaine hydrochloride had been delivered to the cities he testified about.  This estimate goes far beyond the relevant quantity for purposes of the guidelines.

The defendant has not put forth any credible evidence to demonstrate Wesley's estimate is not reliable.  The Court credits that testimony that the defendant is responsible for a quantity of cocaine of 500 kilograms in addition to the 100 kilograms identified by the three witnesses we talked about earlier.

Did we include the first kilo?  Was that -- the controlled buy.  That was just one; right?

MR. MURPHY:  That was one, Your Honor.  It was 999.1 kilograms.

THE COURT:  Okay.  All right.  So that's just one. Okay.  That's in here.  Okay.

Defendant argues that the quantities identified by trial witness David Garza related to transactions in some of the same states and during the same period as transactions testified by Wesley, Perez-Marquez, Duarte, and Talley.  Thus, he argues that Garza's quantities overlap with the quantities testified to by the other witnesses, and he argues they should not be counted.

The Court concludes that while it is unlikely

OFFICIAL TRANSCRIPT

1    that all of the quantities to which Garza testified overlap

2    with those testified to by other witnesses, some of the

3    quantities likely overlapped, and the Court cannot determine

4    the extent of the overlap.  Accordingly, the Court errs on the

5    conservative side and omits Garza's quantities from its

6    quantity estimate.

7              In addition, Agent Johnson testified that an

8    investigation of the defendant's drug trafficking activities

9    was also conducted by law enforcement in both Houston, Texas,

10   and Mobile, Alabama.  Specifically, Agent Johnson reviewed FBI

11   interview notes of a witness, Daron Jones, who stated that he

12   received five to ten kilos twice per week for two years from

13   the defendant and his brother, Sergio Grimaldo, which he

14   distributed to the Midwest and the East Coast.

15             The agent used the lower 5K figure to come up

16   with an estimated 1,040 kilos attributed to the defendant over

17   this two-year period.  Adding this number to the 600 kilograms

18   the Court previously counted produces a quantity of 1640 kilos.

19   The Court, therefore, finds that the trial evidence and

20   Agent Johnson's testimony together support a reasonable

21   estimate of 1600 kilograms attributable and foreseeable to the

22   defendant as part of the offense conduct and relevant conduct.

23             Therefore, the defendant's correct base level is

24   38, as reported -- correct base level is 38 as reported in the

25   PSR.

OFFICIAL TRANSCRIPT

1              Item 6, Los Zetas.  That Court addresses the

2    objection that defendant was not a cell leader for the

3    Los Zetas drug cartel in Monterrey, Mexico.

4              The government did not produce evidence on this

5    topic at trial.  There was some evidence at trial on this.

6              The witness called today gave testimony on this

7    subject for the purpose of sentencing as it could be relevant

8    to the leader/organizer enhancement sought by the government.

9    The Court heard the testimony of Special Agent Larry Johnson

10   and finds it credible, and this objection is overruled.

11             The defendant's final objection is to the

12   four-level enhancement to his base offense level recommended by

13   the PSR for his role in the offense as a leader/organizer.

14             Under U.S. Sentencing Guidelines, Section 3B1.1,

15   a defendant who was an organizer or a leader of a criminal

16   activity that involved five or more participants or was

17   otherwise extensive is subject to a four-level enhancement.

18             A participant is a person who is criminally

19   responsible for the commission of the offense, but need not

20   have been convicted.  The defendant himself qualifies as a

21   participant under the guidelines.

22             In determining whether an individual was a

23   leader or an organizer, a District Court is to consider various

24   factors, including the exercise of decision making authority,

25   the nature of participation in the commission of the offense,

1   the recruitment of accomplices, the claimed right to a larger

2   share of the fruits of the crime, the degree of participation

3   and planning or organizing the offense, the nature and scope of

4   the illegal activity, and the degree of control and authority

5   exercised over others.  The District Court may find that a

6   defendant exercised a leader/organizer role by inference from

7   the available facts.

8            The key question regarding the scope of the

9   criminal activity is whether the conspiracy involved five or

10  more participants or was otherwise extensive.  The defendant

11  disputes that he was an organizer or a leader of the criminal

12  activity in this case, and he also contends that the conspiracy

13  did not involve five or more participants or was not otherwise

14  extensive.

15           The Court finds that he is wrong on both counts

16  and that the four-level role enhancement is appropriate.  The

17  PSR concludes that the defendant was a leader/organizer on the

18  basis of his role as the main source of supply in a drug

19  conspiracy, as well as on the basis of the control and

20  authority he exercised over his co-defendants, among others, in

21  this case.  The defendant has provided no rebuttal evidence to

22  refute these findings.  These conclusions find ample support in

23  the evidence adduced at trial.

24           The record is replete with witness descriptions

25  of defendant's control over operations and personnel.  For

1    example, more than one witness testified to waiting for phone

2    calls from the defendant in which defendant would give orders

3    to pack cocaine and make deliveries.  One witness described

4    this as being on stand-by.

5              There's other testimony that defendant directly

6    recruited several of the participants in the conspiracy.

7    Another co-defendant described the command structure as

8    follows:

9         "Q.  Who was over you?

10        "A.  Efrain, Sergio, David.

11        "Q.  What does that mean?  He was above you?

12        "A.  He was, like, the boss.  Like I worked for him

13    and guys worked for me.

14        "Q.  Would you describe yourself as being near the

15    middle or near the top?

16        "A.  In the middle.

17        "Q.  Would you describe Efrain as being near the

18    middle or near the top?

19             The answer was:

20        "A.  The top."

21             And this was the testimony of Mr. Talley, I

22    believe.

23             There are many other examples.  Accordingly,

24    evidence from the trial overwhelmingly supports the PSR's

25    conclusion that the defendant played a leader/organizer role in

1    the conspiracy.

2                   Secondly, there's no merit to defendant's

3    argument that there were fewer than five participants in the

4    criminal activity or that the activity was not otherwise

5    extensive.  The Court could count only the most obvious members

6    of the conspiracy and easily surpass five participants.

7    Efrain, his brother Sergio, Duarte, Talley, Perez-Marquez,

8    Wesley, Garza.

9                   Trial testimony also indicated other likely

10   participants in the conspiracy at different points of time,

11   Tio, Chapa in Mexico, and Po-Show in New York, and a man

12   identified as defendant's uncle.

13                  Was that Tio?  No, that was Tio.  So Tio and the

14   uncle are the same person.

15                  Accordingly, there's a sufficient number of

16   people and participants in the criminal activity and the

17   defendant -- there was ample evidence of his leader/organizer

18   role.  So this objection is overruled.

19                  The defendant also has two motions for a

20   downward departure and a request for a reduction of his base

21   offense level.

22                  Do you need to be heard on that or can I just

23   rule on it?

24           MR. JORDAN:  You can rule on it.

25           THE COURT:  I'm sorry?

OFFICIAL TRANSCRIPT

1      **MR. JORDAN:**  Yes.

2      **THE COURT:**  Just rule on it.  Okay.

3      **MR. JORDAN:**  Yes.  You can rule on it, Your Honor.

4      **THE COURT:**  All right.  The defendant requests a

5  downward departure on the grounds that his criminal history

6  category overrepresents the seriousness of his criminal

7  activity.

8           His arguments in favor of the downward departure

9  in connection with his criminal history score mirror his

10  arguments in support of his objection concerning his criminal

11  history score.  Accordingly, for the same reasons the Court

12  overruled defendant's objections about his criminal history

13  score, the Court denies defendant's request for a downward

14  departure on the basis of his criminal history score.

15           Second, the defendant requests a two-point

16  reduction in his base offense level on the basis of the new

17  sentencing guidelines for drug offenders.

18           Pursuant to Section 944(p) of Title 28 of the

19  united States Code, on April 30th, 2014, the Sentencing

20  Commission submitted to Congress an amendment to the sentencing

21  guidelines reducing the guidelines applicable to drug

22  trafficking offenses by two levels in the drug quantity table

23  resulting in lower guideline ranges for most drug trafficking

24  offenses.  The defendant asked the Court to apply this

25  two-point reduction to his base offense level.

OFFICIAL TRANSCRIPT

1          When sentencing, the Court is to consider the
2   sentencing range established for the applicable category of
3   offense committed by the applicable category of defendant as
4   set forth in the guidelines that are in effect on the date the
5   defendant is sentenced.  The proposed amendment does not go
6   into effect until November 1st, 2014, assuming Congress doesn't
7   object to it.  Thus, it is not appropriate to calculate
8   defendant's base offense level under the guideline range based
9   on the proposed amendment at this time.
10          The Court acknowledges that the proposed
11   amendment is designed to apply retroactively.  If Congress lets
12   the amendment stand, eligible incarcerated defendants will be
13   able to ask the courts to reduce their sentences, but that
14   can't take place until the amendment goes into effect, and any
15   such modification can't go into effect until 2015, I think.
16          It's 2015; right?  Okay.
17          There being no further -- so that request is
18   denied.
19          There being no further objections to the factual
20   statements contained in the presentence investigation report,
21   the Court adopts the statements in the PSR with the additions
22   of all the testimony that we received today as its findings of
23   fact.  The Court further orders that the report, except for the
24   sentencing recommendation, be filed in the record and under
25   seal.

OFFICIAL TRANSCRIPT

1          Do you want to come up here?

2          Mr. Grimaldo --

3          You can stand up, Mr. Murphy.  I need everybody

4     standing up.  No, not there, there.  There --

5          **MR. MURPHY:**  Okay.

6          **THE COURT:**  -- at the microphone.

7          **MR. MURPHY:**  I got it.

8          **THE COURT:**  Mr. Grimaldo, you've been found guilty of

9     one count of conspiracy to distribute and to possess with the

10    intent to distribute five kilograms or more of cocaine

11    hydrochloride, in violation of Title 21, United States Code,

12    Section 841(a)(1) and 841(b)(1)(A), all in violation of

13    Title 21, United States Code, Section 846.

14          The Court has consulted the United States

15    Sentencing Guidelines and determined that the advisory

16    sentencing guidelines for you are as follows:

17          There is a total offense level of 42;

18          You have a criminal history category of II,

19    which indicates an advisory range of 360 months to life;

20          At least five years of supervised release;

21          A fine range of $25,000 to $10 million, plus the

22    cost of supervision;

23          And a $100 special assessment.

24          There was no plea agreement in this case.

25          Mr. Grimaldo, is there anything you want to say

OFFICIAL TRANSCRIPT

1  before I impose sentence?

2        **THE DEFENDANT:**  Yeah.  First of all, I'd just like to

3  thank you for giving me a fair trial.

4        Second of all, I never received any kind of deal

5  from the government or my lawyer.  They never came to me to try

6  to offer me any kind of time.  Never.  Never.

7        Third of all, I never received my Jencks Act

8  material a week prior to my trial, so I couldn't really discuss

9  anything with my lawyer to defend myself against the people who

10  were coming in on behalf of the government.

11        And fourth of all, I just want to let you know

12  that I have a family.  I have three kids.  My mom.  And I just

13  have a family, and, you know, I want to ask you for a second

14  chance in life.  And I'd like to -- just to say that.  And God

15  bless you, and God bless America.  That's it.

16        **THE COURT:**  All right.  Mr. Jordan.

17        **MR. JORDAN:**  Your Honor, I would maintain the

18  objections that we made earlier, and, for the record, I would

19  object to your findings and your conclusions.

20        Your Honor, I would indicate that Mr. Grimaldo's

21  criminal history is very limited, notwithstanding the fact that

22  he has this one very serious conviction in his past.  This is

23  his first conviction as far as drugs is concerned.  If Your

24  Honor would recall the numerous letters that you've received

25  from his family members as well as from individuals who some

OFFICIAL TRANSCRIPT

are associated with law enforcement in Mexico.

**THE COURT:** Yeah. We heard how reliable that was today.

**MR. JORDAN:** Well, that's not consistent with the picture that's been presented here in court. And I would suggest to Your Honor that Mr. Grimaldo is really -- this is his first conviction as it relates to drug activity. He's made it clear that he is not going to ever be involved in that kind of activity again.

And despite the conviction -- despite the jury's finding, Your Honor, it is important to note that there was very, very little to support the testimony of one witness after another indicating the quantity, the large -- the enormous quantity of drugs that were involved in this case.

And I think that that is significant, and it bears directly upon the finding that he is responsible for such a huge cocaine distribution organization. The fact that you have individuals who are almost by their nature not reliable witnesses other than with verification --

**THE COURT:** You used to be a prosecutor. How many cases do you ever see made without cooperating witnesses?

**MR. JORDAN:** Very few. But usually there's something else to support them, some kind of physical evidence of some kind to show --

**THE COURT:** Like your voice on a tape?

1          **MR. JORDAN:**  Right.  Like that kind of thing.  And

2     there was only -- there was only one or two instances of that

3     kind in this case.  And that's what -- that's the point that

4     I'm making, the disparity between the huge quantity and the

5     lack of that kind of evidence, the tapes, the surveillance that

6     would corroborate the testimony of individuals who are

7     testifying pursuant to a plea agreement.  I think that that is

8     unusual in this case that we'd be talking about such a large

9     quantity and yet with so little confirmation in the way of

10    physical or agent testimony.

11              And I think that that's one of the things that

12    sets this case apart.  And I would ask that Your Honor take

13    that into consideration in determining at what end of the

14    sentencing guideline range Mr. Grimaldo is to be sentenced.

15    Your Honor, I would ask that he be sentenced at the bottom of

16    the guideline range.

17          **THE COURT:**  Mr. Murphy.

18          **MR. MURPHY:**  Your Honor, just as a note to the

19    defendant's statement.  The government fully complied with all

20    discovery, including *Jencks*.  We had many discussions with his

21    counsel about the case.  This was one of the cleanest

22    prosecutions I think you can find on the record in terms of

23    attorney/client cooperation, providing information, and

24    presentation at trial.  There was no surprises here.

25              Although the Court heard a great deal of

OFFICIAL TRANSCRIPT

1   information about the inner workings of this vast conspiracy,
2   what the Court did not hear about, and what the government
3   would like to give voice to, is the incalculable harm that
4   dumping 1600 kilograms or more of cocaine hydrochloride does to
5   this nation.
6                    There are families.  There are people who
7   ingested this stuff and we will never know all their names or
8   maybe any of their names, but what this defendant did to their
9   lives for a profit can properly be considered by this Court.
10                   Your Honor, it's rare when we reach the top of
11  the pyramid.  You've seen lots of drug cases that involve New
12  Orleans based, state based, maybe multi-state based drug
13  offenses.  Here we're talking about transnational shipments of
14  hundreds of kilograms to this district and other districts.  We
15  are at the top.  The Zeta organization, as the agent testified
16  to, is a known notorious drug cartel who pumps this stuff into
17  this country, into this district for enormous profit and for
18  enormous harm.
19                   Your Honor, the government believes the top of
20  the guidelines are appropriate.  The Court only had to find
21  150 kilos or more to justify the base offense level.  Think
22  about how far beyond that we are and how that calls out for a
23  top of the guideline sentence.
24                   Your Honor, the government would ask that a life
25  sentence be imposed in this case.  That's a guideline sentence,

1    and it's at the top.

2          **THE COURT:**  All right.  Thank you.

3               The Court has considered the advisory guidelines

4    and all the factors set forth in Title 18, Section 3553(a) and

5    finds it appropriate to give a sentence within the advisory

6    guideline range.  It's the judgment of the Court that the

7    defendant, Efrain Grimaldo, is hereby committed to the custody

8    of the Bureau of Prisons for a term of 405 months.

9               Upon your release from imprisonment, you shall

10   be placed on supervised release for a term of five years.

11   Within 72 hours of your release from the custody of the Bureau

12   of Prisons, you shall report in person to the probation office

13   in the district to which you are released.

14              The Court imposes this sentence at this point in

15   the guideline range because it adequately reflects the nature

16   and seriousness of the offense, and to protect the public from

17   further crimes by the defendant.  The defendant's involvement

18   in this drug scheme was substantial.  This sentence serves as a

19   just punishment and will afford adequate deterrence to criminal

20   conduct and will promote respect for the law.

21              It is the finding of the Court that the

22   defendant is not able to pay a fine, and I will not impose a

23   fine.

24              While the defendant is on supervised release, he

25   shall comply with the mandatory and standard conditions of that

| | |
|---|---|
| 1 | program and he shall not possess a firearm, a controlled |
| 2 | substance, and shall not commit any federal, state, or local |
| 3 | crime. |
| 4 | In addition, I impose the following special |
| 5 | condition: |
| 6 | If deported, the defendant is not to reenter the |
| 7 | United States without the written permission of the Secretary |
| 8 | of Homeland Security. |
| 9 | The defendant shall also cooperate in the |
| 10 | collection of a DNA sample. |
| 11 | It is further ordered that the defendant shall |
| 12 | pay to the United States a special assessment fee of $100, |
| 13 | which is due immediately. |
| 14 | Mr. Grimaldo, at this time, I want to advise you |
| 15 | that you have the right to appeal your conviction in this |
| 16 | matter and your sentence.  If you are unable to afford the |
| 17 | services of an attorney to handle your appeal, counsel will be |
| 18 | appointed for you.  If you cannot afford it, a transcript of |
| 19 | the record in this case will be prepared for appeal at the |
| 20 | government's expense. |
| 21 | Any notice of appeal must be filed within |
| 22 | 10 days after the entry of judgment.  Do you understand this? |
| 23 | THE DEFENDANT:  Yes, Your Honor. |
| 24 | THE COURT:  And is your current wish to appeal this |
| 25 | conviction? |

OFFICIAL TRANSCRIPT

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Do you hear that?

3          **MR. JORDAN:**  Your Honor, I will file the motion

4     within the next day or so -- the notice of appeal.

5          **THE COURT:**  Okay.

6               All right.  If there's nothing further, the

7     defendant is remanded to the custody of the United States

8     Marshal.

9          **MR. JORDAN:**  Thank you, Your Honor.

10          **MR. MURPHY:**  Thank you, Your Honor.

11          **THE DEPUTY CLERK:**  All rise.

12          (WHEREUPON, the proceedings were concluded.)

13                         *******

14                         <u>**CERTIFICATE**</u>

15          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

16     for the United States District Court, Eastern District of

17     Louisiana, do hereby certify that the foregoing is a true and

18     correct transcript, to the best of my ability and

19     understanding, from the record of the proceedings in the

20     above-entitled and numbered matter.

21

22

23                         *s/Jodi Simcox, RMR, FCRR*
                          Jodi Simcox, RMR, FCRR
24                        Official Court Reporter

25

OFFICIAL TRANSCRIPT